Assault with intent to murder; sentence: four years imprisonment.
Appellant was charged with throwing a lighted jar of kerosene at Jimmy Joe Nelson on the night of November 25, 1976. The weapon was what is commonly called a "Molotov cocktail" or fire bomb.
Both appellant and Nelson were prison inmates at the Kilby Correctional Center in Montgomery County when the incident occurred. Appellant was housed in Cell Block B which was located above Block A where Nelson was quartered. A balcony ran the length of Block B. By leaning over the railing or lying on the balcony floor, a person could look over the edge of the balcony and see the cells below.
The evidence established that appellant and Nelson had been arguing about a football game shown on television earlier in the day. Testimony by prison guard John Banks, in the strongest light for the State, would tend to show that appellant was released from his cell on the pretense of emptying his trash can. He was carrying a brown paper bag, but Banks did not inspect it. Banks was down the corridor checking cells when he was informed he should not let appellant of out his cell. About then he heard someone shout, "fire."
Although a dispute arose over the facts at this point, Banks' final testimony was that he saw appellant lying on the balcony floor, and a small fire was going in a cell below. Banks went to the floor below and saw others stomping on some broken glass and a burning rag on the floor of the cell. Nelson had been taken to the hospital.
Guard Nathaniel Bryant was working on Cell Block A when the incident occurred. Bryant saw appellant lying on his stomach on the balcony floor immediately above Nelson's cell. He saw a blaze of fire, and he went immediately to Nelson's cell and pulled him out. Nelson had a laceration on his arm from the broken glass, and his hair was singed. Bryant saw no one else around, over, or beside Nelson's cell other than the appellant.
Counsel for appellant brought out on cross-examination that Bryant had earlier signed a statement that he actually saw the *Page 1060 
appellant light the rag in the jar and throw it at Nelson's cell. Bryant confirmed that the signed statement was true.
The victim Nelson testified in pertinent part as follows:
 "Mr. Banks let him [appellant] out and he walked up there and come down there and Mr. Bryant said Everhart, don't do that. And I got off a little stool I was sitting on and walked up there and was standing at the door when Bryant hollered at Everhart. Said, Everhart, don't do that. And I looked up. And about that time that kerosene jar and all hit the bars and broke and splattered. And the fire — set my hair — my hair was long then and it set it on fire. And I got glass in my eye, also. And I told Mr. Bryant I wanted to go the the hospital and he took me down to the hospital. . . ."
Defense witness, inmate Love Wilson, testified that on that occasion in question, he saw appellant talking to another inmate when he heard a "commotion" below. He said appellant and the other inmate went to the railing, lay down, and looked over the balcony to the cells below. Wilson said he did the same thing. He did not see the appellant throw anything and did not see a fire.
 I
Appellant contends that the trial judge erred by forcing him to stand trial in prison clothes. During a hearing outside the presence of the jury, the following occurred in pertinent part:
 "MR. WILLIAMS: Is that yours or was it issued to you by the State of Alabama?
 "THE COURT: He asked you about your shirt, boy, so don't point at your pants. Did the State of Alabama issue you that shirt, boy?
"THE DEFENDANT: No, sir.
"THE COURT: Where did you get it?
"THE DEFENDANT: I got it at home.
 "THE COURT: That is yours? You bought that in the free world?
"THE DEFENDANT: My people bought it.
 "THE COURT: Now let's talk about your shoes. Did you get those issued to you?
"THE DEFENDANT: No, sir.
 "THE COURT: You got those in the free world, didn't you?
"THE DEFENDANT: Yes, sir.
"THE COURT: What about your pants?
"THE DEFENDANT: They are also from the free world.
* * * * * *
 "THE COURT: . . . You should have found out whether these were prison clothes or not. They are not prison clothes. And if you had been an observer of prison life in any of your legal practice, you would have known they were not prison clothes. They are not prison clothes. The Sheriff of Montgomery County is careful in never allowing a prisoner to walk into this Courtroom with prison clothes on. So, you have made a reckless charge. Now back it up . . ."
* * * * * *
 "THE DEFENDANT: Well, Your Honor, I am trying to explain. We are not allowed to wear free world clothes. These clothes are the same or similar — these clothes are just like State clothes.
"THE COURT: No, sir. They are not.
 "THE DEFENDANT: The shirts are made the same. The only thing, they are long sleeves and short sleeves. The jeans, understand —
"THE COURT: Well, are you objecting to his clothes?
"MR. WILLIAMS: Do you object to the clothes?
"THE DEFENDANT: Yes, sir.
"MR. WILLIAMS: Yes, sir.
 "THE COURT: Well, your objection is not well taken. Sit down.
"MR. WILLIAMS: Yes, sir.
"THE COURT: Let the Jury back in."
The record shows conclusively that the appellant was not dressed in prison clothes at the time of the trial. Whether the appellant's clothing was similar to prison garb *Page 1061 
is not established by the record. Counsel made no showing of similarity between the clothing of the accused (which was admittedly supplied by relatives) and clothing issued by the state. The only comparison in the record was that, "[t]he shirts are made the same. The only thing, they are long sleeves and short sleeves. . . ." That description tells us absolutely nothing.
Secondly, the appellant waited too late to raise the objection. In Clark v. State, 280 Ala. 493, 195 So.2d 786
(1967), the Supreme Court stated:
 "We hold that the defendant waited too late to move for a mistrial because of his clothing. If he seriously believed he could not get a fair trial while dressed in prison clothes, a motion to that effect should have been presented to the court prior to the time the jury panel was brought into the courtroom."
In the instant case, the appellant waited until after the jury was selected, impaneled, and sworn before making his objection known to the trial court. Thus, not only was there no substance to the objection, it also came too late.
 II
John Banks, in testifying for the State, stated that after he heard someone shout, "fire," he turned around and saw the appellant standing by his cell. On redirect examination by the State, Banks admitted that he gave a statement to state investigators which was different from his present testimony. He was handed a copy of the statement and, after reading it, had considerable difficulty in answering questions on behalf of the State. After refreshing his recollection from his prior inconsistent statement, the questioning went in pertinent part as follows:
 "Q. (Mr. Price continuing) Officer Banks, after you have read State's Exhibit No. 1 to refresh your present recollection, sir, I ask you, is State's Exhibit No. 1 a true copy of the statement that you gave the State investigator?
"A. I do not believe so.
"Q. Sir?
"A. I do not believe so.
 "Q. So, you are saying that the State investigator has written a statement that is incorrect, or something you didn't tell him?
"A. No. I seen him about, maybe, four times.
 "Q. Well, did you sign a statement up there? After you gave him the statement, did you sign it?
"A. I don't remember whether I did or not.
 "Q. All right. On all of the statements that you gave him, did he allow you the opportunity to read what you had given him?
"A. He read over it.
 "Q. He read over it? Did you understand at that particular time what it was that he was reading?
"A. Yes.
 "Q. Okay. Did you at that time tell him what he read you was incorrect or was not exactly what you had told him?
 "A. He asked me was this to the best of my knowledge; was it true? I told him I believe so.
 "Q. And then do you recall the State investigator reading State Exhibit No. 1 back to you at that time you gave it to him or some later time?
"A. No, sir.
"Q. You don't recall that?
"A. No, sir.
 "Q. Okay. Well, let me ask you this. Do you recall — you are saying the statement here is incorrect?
"A. No.
"Q. It is correct?
"A. Well, now —
 "Q. Is the statement here that I just showed you to refresh your present recollection of what you stated on December 2nd, is it correct or incorrect?
"A. Correct.
 "Q. It is correct. It is your testimony then that State's Exhibit Number 1, which was shown to you to refresh your present recollection what you stated on December the 2d 1976, is correct. Is that right? *Page 1062 
"A. Yes.
 "Q. Then let me ask you, sir, now that you have refreshed your present recollection, where was Jimmy Everhart when you turned around and looked back?
"A. (No response).
 "THE COURT: Mr. White, send the Jury into the Jury Room.
 "(Whereupon, the Jury was removed from the Courtroom and the following proceedings were had out of the presence of the Jury:)
 "THE COURT: Are you still an employee of the State of Alabama?
"A. Yes, sir.
 "THE COURT: All right. Now, you get down off that witness stand. Get down.
"Give him that paper.
 "Now, if you don't want me to recommend you be fired for incompetence, you get around here and you read this statement and you try to remember what happened on this occasion. And if you are not able to remember, then I am going to recommend to the Commissioner of the Department of Corrections that you be fired for either lying on the stand or being unable to do your duty.
 "Now, Mr. White, you carry him into one of those witness rooms.
 "And when you get through reading that thing, you come back in and you tell me whether or not you can remember what happened on this occasion or not. You are under arrest, in effect. You are in the custody of Mr. White until you come back.
"Now we will have a ten minute recess."
After the recess, counsel for appellant moved for a mistrial because of the court's instructions to the witness. The following then occurred:
 "THE COURT: Do you want to question this witness as to whether or not he is required to tell the truth, the whole truth, and nothing but the truth, so help him God? Do you want to ask him whether he has been encouraged to tell anything but the truth?
"MR. WILLIAMS: No, Your Honor.
 "THE COURT: Well, are you implying that the Court has told him to tell something other than the truth?
"MR. WILLIAMS: No, sir.
 "THE COURT: All right. Have you been told — has anybody encouraged you to tell anything but the truth?
"A. No, sir.
 "THE COURT: All right. Is that what you are going to tell?
"A. Yes, sir.
 "THE COURT: All right. Are you going to tell it in a fashion where you don't have to look up at this ceiling, and if you don't understand the question are you going to say you don't understand the question?
"A. Yes, sir.
 "THE COURT: I don't want to waste my time or this Jury's time, when you have reasonable intelligence and a reasonably intelligent question is asked you that you can't give an answer to. Do you understand that?
"A. Yes, sir.
 "THE COURT: Okay. Now have you got any objections to that instruction, Mr. Williams?
 "MR. WILLIAMS: Not that instruction. It was the other one, Your Honor.
"THE COURT: Well, what was the other instruction?
"MR. WILLIAMS: About recommending —
"THE COURT: Do you have a question of that statement?
"MR. WILLIAMS: Not this one. The other one.
 "THE COURT: I am talking about this statement there. Do you have any reason to believe that there is a lie in that statement?
 "MR. WILLIAMS: Well, Your Honor, he said it wasn't like what he told the investigator.
"THE COURT: Did you tell that investigator a lie?
"A. No, sir.
 "THE COURT: Did he write down something that you didn't tell him? *Page 1063 
"A. No, sir.
 "THE COURT: After you have read that statement, is that what happened?
"A. Yes, sir.
 "MR. WILLIAMS: I am just repeating what he said on the stand, Your Honor.
 "THE COURT: He was either obviously confused or he wasn't paying much attention to the question.
 "MR. PRICE: Now, as I recall it, if it please the Court, the witness did testify to my last question that this was the statement.
 "THE COURT: Well, I don't think the witness was interested enough to listen to the question. But I think maybe I have his attention now. Let the Jury in . . ."
Banks then testified, in the presence of the jury, that he had in fact seen the appellant lying on the floor of the balcony rather than standing by his cell.
The State had a right to interrogate its own witness concerning his prior statement inconsistent with his present testimony for the purpose of refreshing his recollection or to show surprise. Cross v. State, Ala.Cr.App., 351 So.2d 698
(1977); Randolph v. State, Ala.Cr.App., 331 So.2d 766, cert. denied, Ala., 331 So.2d 771 (1976).
It is obvious from the record that the witness' testimony was not only inconsistent with his prior statement to state investigators, but he also began to give contradictory and inconsistent answers on the witness stand. Whether this was occasioned by fading memory, lack of attention to questions propounded, incompetence, outright contempt, or perjury, the trial judge was in a better position to determine than we are. The trial judge was able to observe the demeanor of the witness, to hear the inflection in his voice, and to evaluate his sincerity or lack of candor. No objection was made to the remarks of the trial judge until after a recess, and the witness returned to the courtroom with either a refreshed recollection or a more sincere attitude toward the serious business of testifying in a court of law.
Assuming the objection to be timely and sufficiently specific, we find no reversible error in the trial judge's blistering admonition to the witness outside the presence of the jury. As was said in Brantley v. State, Ala.Cr.App.,335 So.2d 189, cert. denied, Ala., 335 So.2d 194 (1976), while the trial judge could and should have been milder in his admonition: "It was clear that the witness had made two irreconcilable statements in testimony. The trial court did not direct the witness toward either statement, but made it clear that the witness should be careful in finally stating which of the two statements was correct. . . ." Also see: Huffman v.State, Ala.Cr.App., ___ So.2d ___ [1977]; and 23 C.J.S. Criminal Law §§ 995, 996.
A trial judge has certain sanctions available to impose against recalcitrant or untruthful witnesses such as citing the witness for contempt or charging him with perjury. A threat to seek termination of the witness' employment is not a legal alternative open to a trial judge. While we do not condone the threat, we nevertheless find no prejudice to the appellant resulted for the following reasons:
(1) The trial judge did not direct the witness toward either version of the conflicting statements. In effect, he only instructed the witness to tell the truth.
(2) The reprimand occurred outside the presence and hearing of the jury.
(3) The testimony of all later witnesses to the occurrence, including that of the appellant, was that appellant was lying on the balcony floor. The final testimony of Banks that he saw appellant lying down rather than standing by his cell could hardly be considered so prejudicial as to cause reversal where the appellant himself later testified that he lay down on the balcony to see what caused the commotion below.
We likewise do not conclude that the conduct of the trial judge throughout the course of the trial was so highly prejudicial against the appellant and his counsel as to warrant reversal. While the trial judge used strong language to both the witness *Page 1064 
Banks and to counsel for appellant outside the presence of the jury, we find that the trial judge was exceedingly lenient in allowing counsel to prepare written requested charges after the jury had begun its deliberations and in presenting those charges to the jury on behalf of the appellant after the jury had returned to the courtroom to ask the trial judge a question.
Appellant's argument is that the prejudicial conduct of the trial court toward him throughout the trial climaxed with a crescendo of degradation in the manner in which the court interrogated defense counsel about the details of charging the jury on a lesser included offense. We think the record reveals the opposite. The trial court had a lengthy discussion with the defense counsel about the proper manner of preparing his requested charges and additional form verdicts. The jury was returned to the jury room while counsel was given additional time to compose the requested charges. The trial judge submitted all the requested charges to the jury except the affirmative charge. At the end of the court's oral charge to the jury and at the end of the supplemental instructions to the jury, defense counsel announced that he was satisfied. Likewise, the trial court's discussion with defense counsel about the preparation of requested charges was not objected to and cannot be raised for the first time on appeal. Slinker v.State, Ala.Cr.App., 344 So.2d 1264 (1977). For a synopsis of cases concerning permissible limits of a trial judge's comments, see Butler v. State, 55 Ala. App. 421, 316 So.2d 348, cert. denied, 294 Ala. 754, 316 So.2d 355 (1975).
 III
Contrary to the appellant's contention, we find that the State presented a prima facie case of assault with intent to murder. Testimony by the State's witnesses was sufficiently strong to support a finding that the appellant deliberately threw the fire bomb at the victim. It certainly cannot be said that a fire bomb or "Molotov cocktail" is not a deadly weapon. The law is clear that the use of a deadly weapon raises a presumption of malice unless the circumstances disprove malice. The jury could reasonably infer from the act of throwing the deadly substance at the victim that the appellant intended to kill him. Hall v. State, Ala.Cr.App., 348 So.2d 870, cert. denied, Ala., 348 So.2d 875 (1977).
Affirmed.
All the Judges concur.