Peggy Marie **TAYLOR**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 05–86–00541–CR.

Court of Appeals of Texas, Dallas.

July 30, 1987.

Rehearing Denied Sept. 11, 1987.

Danny D. Burns, Fort Worth, for appellant.

Kathi Alyce Drew, Dallas, for appellee.

Before WHITHAM, ROWE and HECHT, JJ.

WHITHAM, Justice.

Appellant appeals a conviction for arson. The jury assessed punishment at fifteen years confinement in the Texas Department of Corrections. In her first three points of error, appellant contends that the evidence is insufficient (1) to connect her to the fire, (2) to sustain the conviction when the State relied upon an inference based on an inference to prove arson and (3) to prove that the manner and means of starting the fire was unknown to the grand jury. We find no merit in any of appellant's challenges to the sufficiency of the evidence. As to appellant's remaining points of error, we conclude that no fundamental error is found in the charge, that the trial court did not err in charging the jury on the law of parole, that the trial court did not err in failing to order the State to produce transcriptions of tape recordings of witnesses

and that the trial court did not err in submitting a special issue regarding the use of a deadly weapon. Accordingly, we affirm.

This is a circumstantial evidence case. An arson case may be established by circumstantial evidence. *See Massey v. State*, 154 Tex.Crim. 263, 226 S.W.2d 856, 859 (1950) (on rehearing). It is not required that the circumstances should to a moral certainty actually exclude every hypothesis that the act may have been committed by another person, but that the hypothesis intended is a reasonable one consistent with the facts proved and the circumstances, and the supposition that the act may have been committed by another person must not be out of harmony with the evidence. *Vaughn v. State*, 607 S.W.2d 914, 921 (Tex.Crim.App.1980). The standard for reviewing the sufficiency of the evidence on appeal is the same for direct and circumstantial evidence cases; and that is to view the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Garrett v. State*, 682 S.W.2d 301, 304 (Tex.Crim.App.1984), *cert. denied*, 471 U.S. 1009, 105 S.Ct. 1876, 85 L.Ed.2d 168 (1985).

### *The Sufficiency of the Evidence to Connect Appellant to the Fire*

Viewed in the light most favorable to the verdict, the record shows that in the early morning hours of March 8, 1985, fire consumed the home at 8506 Chesham in Rowlett, Texas. Four persons died. Eddie Taylor, appellant's husband, died of thermal burns and smoke inhalation. Appellant's daughters, Michelle Taylor, age eleven, and Tanya Taylor, age eight, also died in the fire. Earl Schultz, a house guest, died in the fire as well. The medical examiner determined that the cause of death for the two children and Schultz was smoke inhalation. Appellant and her fifteen-month-old daughter, Alisa, survived the fire.

George Joseph Harris, a Rowlett firefighter, testified that the fire department received an alarm to 8506 Chesham just after midnight on March 8, 1985. Harris arrived at the home seven to eight minutes later. Harris testified that the fire could be seen from a considerable distance. Harris stated that, while the house was not yet "consumed," it was "well involved," and fire could be seen coming through the roof of the house. Harris noticed a black Datsun "Z" automobile parked in front of the house. As Harris started toward the front of the house, a fellow firefighter came out and yelled at him to attempt entry into the back of the house. Harris then went to the back of the house where he broke the locked gate open. He went through the backyard and patio area, but was unable to enter the house because of the severe flames at that location. Harris noted that the garage door was locked. Harris retraced his steps toward the front of the house and called for a "line." Someone handed a hose line over the fence to Harris, which he used to try to suppress the flames. Harris concentrated his initial efforts in the dining room, where the flames were particularly intense. Initially, he was unsuccessful in suppressing the flames in the dining room. The water Harris directed into the dining room "darkened the flames down" but then the flames would "flare back up." Harris testified that he felt there was the "possibility of an accelerant there" due to the color and appearance of the fire as well as the difficulty he experienced in attempting to suppress the flames. Harris explained that an accelerant was something used to make a fire more intense. As Harris applied water heavily in both the dining-room and the living-room areas, he heard a "number of explosions and pops" that he "took to be some sort of ammunition." While fighting the fire in the dining-room area of the house, Harris had indications of the presence of a body in that area based on the smell.

The bodies of the four victims were discovered in various portions of the house. Eddie Taylor's body was discovered in the dining-room area. Tanya's body was found in the hall bathroom. Michelle's body was found in "bedroom two." Earl Schultz's body was found in the "front" bedroom,

also referred to as "bedroom three." From the record, it is not clear whether Earl's body was found in bed or on the floor of this room. The photographs in the record are photostatic copies that are of no help to this court in determining the location of Earl's body. In testifying about State's Exhibit No. 67, Fire Marshall Baggett, however, testified that Earl's body was "laying right along this wall just as you open the—go through the door there." Vickie Sarlow, who was Eddie's sister and who had lived with Eddie and appellant for a period of time, testified, in essence, that "bedroom number three," which was equipped with bunk beds, was where Tanya and Michelle usually slept, while "bedroom number two" was where the Sarlows stayed. Gil Cagle, a friend of Eddie's, confirmed the usual bedroom arrangements.

Dr. M.G.F. Gilliland, a Dallas County Medical Examiner, testified that Eddie's body was burned so badly that identification had to be made from dental charts. Gilliland testified that Eddie's body was "severely damaged" and that "[m]ost of the skin was absent from the surface of the body, except the back of the body was a little bit preserved." Toxicology reports indicated that Eddie had a blood alcohol content of .22 and that the various body "levels" of the alcohol content "suggest[ed]" that he had been drinking for some time" and was "stabilized" at that level. Gilliland concluded that a person who is physiologically highly intolerant to alcohol and has a .22 alcohol level could lose consciousness. Gilliland found no evidence of injury other than "fire-related" injury. Gilliland noticed that Eddie's back was relatively "spared," indicating that Eddie had not been upright, but prone, during his exposure to the fire. The examiner found that Earl Schultz, who was not as badly burned as Eddie, had an alcohol level of .17.

Jim Badgett, the Dallas County Fire Marshall, arrived at the scene at approximately 1:15 a.m. Badgett testified that firefighters found a gasoline can in the dining-room area of the house. Lieutenant Don Poovey of the Rowlett Fire Department testified that he discovered the cap to a gasoline can inside the garage. The fire originated in the dining room along the south wall of the house. Firemen turned samples of carpet and baseboard from the dining room over to the Southwestern Institute of Forensic Sciences. Fire Marshall Badgett eliminated all accidental causes for the fire. Badgett employed "gas detectors" in an effort to determine the cause of the fire and got a "positive reading." Badgett then utilized "infrared equipment" to confirm "that we had some type of hydrocarbon in that area." Badgett also testified that this was an "accelerant fire" and that the fire was "accelerated with gasoline." Badgett could not, however, ascertain the quantity of accelerant used. Badgett testified that the accelerant used "ignited quickly after being put on the floor." Though Badgett "didn't find any source of ignition," he considered the fire to be a case of arson, which he turned over to the Rowlett Police Department. Debbie Spencer, a trace evidence analyst with the Southwestern Institute of Forensic Sciences, testified that she received samples of carpet and baseboard and a five-gallon gasoline can from Badgett. Spencer testified that a motor vehicle-type of gasoline was present in the can. However, later testimony indicated that Spencer must have been mistaken since the can was too badly burned to have contained gasoline. Gasoline was found in the carpet and baseboard material from the dining room.

Loy Taylor, a certified arson investigator, was hired by an insurance company to determine the cause and origin of the fire. Taylor found no accidental cause of fire. Taylor testified at some length concerning the "Schmidt hammer test." The purpose of the Schmidt hammer test is to determine the strength of concrete in order to determine how the heat from a fire affected the concrete in the house in question. Before he performed this test, Taylor did not know where in the dining room a body had been found, or where in that room a gasoline can had been found, or that "positive hydrocarbon findings" had been ascertained. Taylor testified that, when he ran over 400 tests in the dining room, he got some "rath-

er radical findings from one location to the next." The softening of the concrete in some parts of the dining room, a result uncovered by his testing, "supported and enhanced" his feelings about the presence of an accelerant in the dining room. Taylor testified that he found a "pattern" which indicated the location where the adult body was found in the room. As Taylor testified, "any adult body will help to insulate the floor from further damage, and the body gives off a lot of fluids and liquids." The patterns of the greatest burning "tracked around the pattern of the body," indicating a pattern of flammable liquid.

The State adduced testimony regarding the aggressive character of the Taylor family's doberman, "Brandy." Larry Johnson, Eddie's cousin and Brandy's prior owner, testified that Brandy was the "meanest" and "most aggressive" doberman that he had ever owned. Johnson stated that Brandy would bark "if she saw something" in a watch dog capacity. Virginia Johnson, Larry Johnson's wife, testified that Brandy was a very good watch dog. Vickie Sarlow, who lived in the Taylor home until shortly before the fire, testified that Brandy was a "mean" doberman who barked at most people, save a few family members. Don Sarlow, Vickie's husband, described Brandy as a very aggressive, loud doberman "with anyone she didn't know." In Don Sarlow's opinion, Brandy would bark at anyone coming down the alley including him or Eddie until they got where she could see them. Betty Bogard, a neighbor, also described Brandy as "very aggressive."

Testimony established that the neighborhood remained quiet on the night of the fire until the fire itself occurred. John L. Gezelius, a neighbor, had been working on his car in the neighborhood until "about midnight" on the night of the fire. Gezelius saw no other people or cars out in the neighborhood that night. Betty Bogard, a neighbor who had retired between 11:15 and 11:30 p.m., had noticed nothing unusual during the night prior to the fire. Both Gezelius and Bogard testified that there were lots of dogs in the neighborhood. Neither, however, heard any dogs barking until shortly after midnight, just before they both noticed the fire. Victoria Gallenberg-Baxter, the neighbor who lived directly across the street from the Taylors', testified that she arrived home "a little before" midnight. Gallenberg-Baxter drove in front of her house to check the mail. She saw nothing unusual and testified that the neighborhood was quiet. Sandra Schneider, the Taylors' next-door neighbor, testified that she heard no dogs barking that evening just before the fire. Bill Coker, another neighbor, testified that nothing unusual occurred that evening. Coker remembers some dogs barking, but not until the fire started.

Several witnesses for the State testified that appellant and Eddie had been experiencing marital problems. Eddie was described as a "dominant man," the "king of the house." Appellant's physician, Dr. Steven Reeder, testified that appellant had complained to him that she was having problems with Eddie. Because appellant seemed "bothered, depressed and anxious" about her problems with Eddie, Dr. Reeder had suggested that she see a psychiatrist. Appellant had told Reeder that Eddie was a "heavy drinker of alcohol." The State adduced a great deal of testimony regarding Eddie's tolerance for alcohol. Numerous witnesses stated that Eddie would drink, would pass out cold, and could not then be awakened. There was also evidence that Eddie drank when he played dominoes. Eddie had admitted to Don Sarlow that he was an alcoholic. Doris Cagle testified about her conversations with appellant concerning appellant's marital fears. Cagle testified that appellant felt that she needed to always look "just perfect so that [Eddie] would like her to stay married to him." Testimony disclosed that, before the fire, appellant and Eddie had not had sexual relations in months. Testimony further established that appellant was not happy about her sexual relationship with Eddie. Appellant told several people that she thought Eddie was seeing other women. Don Sarlow testified that he had discussed "extramarital affairs" with Eddie. Appel-

lant complained that Eddie "wouldn't let her go anywhere." Don Sarlow testified that, at the time of the fire, the Taylors "were not getting along well at all."

The State presented testimony concerning Eddie's lack of generosity with appellant. Vickie Sarlow testified that appellant complained that "Eddie only gave her a hundred dollars a week for groceries." Vickie very seldom saw Eddie give appellant money. Appellant confided to Vickie that "she didn't think Eddie gave her enough money to run the household." Vickie testified, however, that appellant usually seemed to have plenty of money. Edith Mihalyi, a friend of appellant's, testified that appellant was having money trouble close to the time of the fire. Appellant told Mihalyi "it was hard to make ends meet" and that Eddie would sometimes not give her enough money. At times, appellant went to the grocery store and did not have enough money to pay for groceries. Mihalyi further testified that appellant took money for groceries from Eddie when he was drunk and had passed out.

The State adduced testimony regarding appellant's concern over Eddie's knowledge of appellant's financial affairs. As Vickie Sarlow testified: "She always wanted to get the mail because she didn't want Eddie to know about the bills and how much they were and long distance calls and her credit union statement." During the time the Sarlows lived with the Taylors, Vickie was under instructions that, if she found appellant's statement from her credit union, she was to put it up. Prior to December 1984, appellant had told Vickie that Eddie had found out about a $10,000 certificate of deposit that appellant had in Wichita Falls, and Eddie wanted appellant to give it to him. Appellant told Vickie that she gave the certificate of deposit to Eddie. Vickie testified that appellant "wasn't on" Eddie's checking account. Bea Binion, the records custodian at First City Bank in Garland, testified that Eddie was the only authorized signatory on his account.

Witnesses testified that appellant wished to have "very costly" plastic surgery which her insurance would not cover. In the few weeks prior to the fire, appellant had seen Dr. James Richard Jenkins, a family practitioner in Rowlett. Jenkins testified that appellant had had a lumpectomy in 1982 and came to him because she feared that she was developing cancer again. Jenkins sent appellant to a plastic surgeon to obtain another opinion about removing the remaining breast tissue and performing implants. As Virginia Johnson testified: "[Appellant] was uncomfortable with the first surgery years ago, and wanted to have plastic surgery to correct it." Johnson also testified that Eddie didn't want her to have the plastic surgery. Appellant had complained to Johnson about the cost of the surgery and the fact that the insurance would not cover the surgery. Vickie Sarlow confirmed that Eddie would not have paid for appellant's plastic surgery. The day before the fire, appellant went to see Dr. Reeder who had treated appellant for breast cancer in 1982. Reeder examined appellant on March 7, 1985, and found nothing to require surgery.

On the night of March 7, 1985, hours before the fire, appellant and Vickie Sarlow had a telephone conversation. Appellant was crying and very upset. Appellant told Vickie that "Eddie had found her credit union statement and ... he was going to kick her butt...." Vickie suggested that appellant tell Eddie that part of the money belonged to Vickie. Later that evening, between 9:30 and 10:00 p.m., Vickie called appellant back to see "how's it going." Appellant said everything was fine, that they were "sitting here drinking and playing dominoes" and were going to the credit union on the following day, March 8. Vickie testified that appellant sounded very happy during the second conversation.

The State introduced evidence concerning appellant's inconsistent behavior during the time of the fire and immediately thereafter. Appellant repeatedly asked for her "babies" but said nothing about either Eddie or Earl Schultz. Testimony established that, normally, appellant did not wear shoes around the house. However, the neighbors who cared for appellant after the fire testified that, on the night of the fire, appellant was wearing cowboy boots. Ap-

pellant constantly wore lots of jewelry. Vickie Sarlow testified that appellant wore her jewelry from the time she got up until she went to bed. However, on the night of the fire, testimony revealed that appellant was wearing very little jewelry. Mrs. Bogard, to whose home appellant was taken, testified that she would "most definitely" remember if appellant had been wearing various types of rings on the night of the fire but that she had no such memory of appellant wearing many rings at that time. Gallenberg-Baxter, the neighbor and nurse who cared for appellant at the Bogard home, noticed that appellant wore only one ring and a "couple of necklaces." Vickie Sarlow testified that, when she visited appellant in the hospital the day after the fire, appellant was wearing "her jewelry." Kim Bragg also testified that appellant had her jewelry at the hospital. There was some testimony that some partially melted jewelry, a ring and a watch, was recovered from the house after the fire and repaired. At the time of appellant's arrest, her book-in photograph revealed that she was wearing a large quantity of jewelry at that time. Randall Sawyer, the minister of the First Christian Church of Rowlett at the time of the fire, testified that he would surely have remembered if appellant had been wearing a lot of jewelry when he saw her but that he did not remember her wearing much jewelry. Sawyer also testified that, at the funeral home, he saw appellant place her head on her husband's casket and say, "I'm sorry, Eddie." In light of his experience, Sawyer thought appellant's behavior at the funeral home atypical. Doris Cagle saw appellant leaving the funeral home. Cagle hugged appellant, and appellant said: "Doris, I didn't mean it to be like this."

The State presented evidence that appellant received a "flash burn" on her arm during the fire. Gallenberg-Baxter testified that she noticed what appeared to be some burns, "superficial," and "first-degree" on appellant's left forearm. Dr. Jenkins, who was summoned to the scene of the fire to care for appellant and her baby and who later saw both in the emergency room, testified that appellant had a superficial burn on her left forearm. Jenkins'

report stated that appellant's "[s]kin was clear apart from the burn on the right forearm, which is superficial and small." Jenkins testified that there were no burns on the palms of appellant's hands. Fire Marshall Badgett testified that one can be burned slightly from a "flash" from a fire. Badgett further testified that a door hot enough to warp out of shape would be hot to touch and that one could expect burns from grabbing such a door handle with bare hands.

The State adduced evidence regarding an alleged burglary at the Taylor home on December 13, 1984. Vickie and Don Sarlow lived with the Taylors at the time of the alleged burglary. Vickie Sarlow testified that she understood that someone had broken into the house, though she herself did not see the intruder. Don Sarlow was also informed of a burglary, though he saw nothing. Five hundred dollars in cash inside appellant's purse, Eddie's business checkbook, which he kept in his office at home, and appellant's checkbook were reported missing. Appellant's purse, though initially thought to be missing, was later found near the swimming pool with its contents spilled out. On the night of this burglary, Brandy was at the house. Neither Vickie nor Don heard anything unusual that caused them to awaken, though they slept in the bedroom closest to the office where Eddie's checkbook was kept. Neither Vickie nor Don heard Brandy bark. Vickie Sarlow testified that appellant's version of the burglary was as follows:

> Appellant said that she woke up and saw someone standing in the door of their bedroom, and she started—she sat up and realized that she was in the line of target, so she laid back down and woke Eddie up, Eddie Taylor up.
>
> \* \* \* \* \* \*
>
> He jumped out of bed and ran outside with his gun and looked around and down the alley and everything and came back in and put his pants on and drove around the block several times to see if he could see anyone.

Subsequently, Eddie's checkbook was found in the Taylors' mailbox. A message

on the first page of the checks read "Guess who, fuck you. Quit messing with my wife, or I'll get you." Appellant's Texas driver's license was also reported stolen in the burglary. L.A. Kellerhan of the Department of Public Safety, however, testified that his records revealed that the only recent licenses issued to appellant were in 1983 at 4314 Sweetbrier in Garland and in April 1985, at 834 Lovers Lane in Grapevine, Texas. There was no request for a license to be issued in December of 1984, nor was there a record of a license issued at 8506 Chesham in Rowlett. Don Sarlow testified that Eddie kept quite a few guns in the house including a .357 magnum pistol at his bed. Sarlow believed that Eddie would defend his house if somebody came in. Charles Green, appellant's brother, testified that Eddie would not have put up with someone stealing from him. Evidence revealed that, around the time of the alleged burglary, someone had "sugared" the gas tank of Eddie's motorcycle.

The State adduced evidence regarding certain activity in appellant's account with Safeway Credit Union. Appellant was the only person authorized to sign on the account. Gary Jones, the custodian of the credit union records, identified a copy of a deposit slip to appellant's Safeway Credit Union account for $12,850. The check for $12,850 was drawn on the account of Eddie R. Taylor and made payable to appellant. The check was returned to the credit union unpaid. Bea Binion, the custodian of records for First City Bank in Garland, testified that there was a "balance held" on the account since Eddie was deceased. Mary Riker, a document analyst with the Federal Bureau of Alcohol, Tobacco and Firearms, testified that she made a comparison of appellant's and Eddie's known signatures to certain checks. Riker testified that the signature on the check for $12,850 was not Eddie's. She further testified that appellant filled out the face of the check and a notation for deposit only. Eddie's attorney explained that he had authorized this check as "emergency" funds for medical and funeral expenses. Riker examined a number of other checks bearing the signature "Eddie R. Taylor" and determined

that it was not, in fact, Eddie's signature upon these checks. Riker identified a number of checks on business accounts made payable to Eddie R. Taylor. Riker identified the endorsements on the back of these checks on business accounts as being appellant's endorsement underneath the signature "Eddie R. Taylor," but testified that the signature purporting to be Eddie Taylor's was not, in fact, that of Eddie Taylor. Riker also identified several checks where there were "good indications" that appellant filled out the face of the check but the signatures, purporting to be those of Eddie Taylor, were, in fact, not Eddie's. Several of these checks had been deposited to the Safeway Credit Union.

When the Sarlows moved out of the Taylor home, the Saturday before the fire, they moved nothing in appellant's Datsun "Z" car. However, a neighbor, Wayne Baxter, testified that, a few days before the fire, he saw two blond women loading "a lot of clothes" into appellant's car. Baxter could identify neither woman. The State adduced testimony regarding appellant's affection for her Datsun "Z" car. Larry Johnson testified that, after the fire, appellant gave him the keys to the "Z" so that he could store it for her. These keys were neither burned nor charred.

Appellant did not testify. However, she gave her version of the fire to several different witnesses. Vickie Sarlow testified that appellant told her what had happened. Vickie testified that:

> [Vickie Sarlow]: [Appellant] said she was running bathwater, and she heard a, something like an explosion. And she ran out of the bathroom, and the wall behind Alisa's bed was burning, and she grabbed Alisa and tried to get out the door but the door wouldn't open, so she unlocked it and tried again and she still couldn't get the door to open, so she—she lost Alisa and found her and crawled to the window and threw a seat through, and got her and Alisa out and ran around and tried to get the other two children out.

[Prosecutor Hasse]: Did she say about what time it was when she went to take a bath?

[Vickie Sarlow]: She said she went in about midnight.

[Prosecutor Hasse]: All right. At any point did she say anything about—let me go back. When you talked to her on the phone earlier, she said they had been drinking and playing games?

[Vickie Sarlow]: Playing dominoes.

[Prosecutor Hasse]: Dominoes? And when they were doing that, did she say where they got the alcohol?

[Vickie Sarlow]: She said that they all rode over to the liquor store together and got it.

[Prosecutor Hasse]: Did she say what vehicle they were in?

[Vickie Sarlow]: The truck.

[Prosecutor Hasse]: The truck, meaning Eddie's truck?

[Vickie Sarlow]: Eddie's truck.

[Prosecutor Hasse]: Is that just a standard sort of pickup?

[Vickie Sarlow]: It was a double-cab Ford truck.

[Prosecutor Hasse]: All right. When, again back when you talked to Peggy about the fire, did she say where Eddie was at the time she went in to draw the bathwater?

[Vickie Sarlow]: He was sitting at the dining room table.

[Prosecutor Hasse]: All right. Did she say whether or not he was passed out?

[Vickie Sarlow]: She told me that he was nodding, but that he understood her when she said that she was going to take a bath.

[Prosecutor Hasse]: All right. And what about where the girls were?

[Vickie Sarlow]: They were in bed.

[Prosecutor Hasse]: And did she say anything about where Earl was?

[Vickie Sarlow]: Earl had left and went to bed, too.

[Prosecutor Hasse]: All right. Now, was there any specific reason you talked to Peggy about whether or not Eddie was awake at the time of the fire?

[Vickie Sarlow]: Yes, because I felt that if Eddie hadn't have been really drunk, he would have either been headed towards the girls to get them out, or he would have—there was a glass window—I felt that he would have at least tried to get out hisself [sic].

[Prosecutor Hasse]: All right. And is that why you asked her about Eddie?

[Vickie Sarlow]: Yes, sir, that's why I asked her if Eddie was drunk.

[Prosecutor Hasse]: You said a minute ago, playing dominoes?

[Vickie Sarlow]: Yes, sir.

[Prosecutor Hasse]: Was there a specific game that they played and you played when you were over there at the Taylor house?

[Vickie Sarlow]: I didn't ever play, but Eddie like[d] to play moon.

[Prosecutor Hasse]: All right. And moon is a type of dominoes game?

[Vickie Sarlow]: Yes, sir.

[Prosecutor Hasse]: When he played dominoes, did he drink?

[Vickie Sarlow]: Sometimes; sometimes he didn't.

[Prosecutor Hasse]: And where in the house did they normally play dominoes?

[Vickie Sarlow]: In the dining room.

Doris Cagle testified to the following version:

[Doris Cagle]: [Appellant] told me that she had been in the bedroom, they had been playing dominoes or something, and she had been in the bedroom, and she heard this explosion, like, and she looked through the bedroom door and saw Eddie—

\*　　\*　　\*　　\*　　\*　　\*

[Doris Cagle]: She saw Eddie standing in the doorway, dining room, with his hands up, and that he was on fire.

Gil Cagle, Mrs. Cagle's husband, testified to the following:

[Gil Cagle]: Well, we asked [appellant] what happened, and she said she didn't know. She heard an explosion and there was fire, and she saw Eddie and that he

was in the fire or on fire, with his hands up in the air.

[Prosecutor Hasse]: All right. Did she say he was lying down or up or—

[Gil Cagle]: Standing.

[Prosecutor Hasse]: All right. Did she say anything else about whether or not she made an attempt to help Eddie Taylor?

[Gil Cagle]: No.

Virginia Johnson testified that:

[Virginia Johnson]: That [appellant] had gone in to—that they had been playing dominoes, and she had excused herself and gone in to draw a bath. And she had the—had just started drawing the bath, and she heard a popping sound, and then a, I believe she said a small explosion.

And she went out into the bedroom, and the curtain behind the baby's bed was on fire. So she grabbed the baby and tried to get out the door, but it wouldn't open.

And she said something like, if Alisa hadn't kept crying she probably wouldn't have come to her senses to get them out of there, but she picked up a little table that was beside the window and broke through the window and got out and ran around to the front, and she heard Tanya screaming in the window for her.

Edith Mihalyi testified to the following version:

[Edith Mihalyi]: Well, [appellant] said they were celebrating kind of an early celebration of Michelle's birthday, and they were playing games. And after the games was over, she was very upset because she had gotten mad at Michelle, she hadn't gone to bed quite as fast as she wanted her to, and she had put—she went in to draw her bathwater—

[Prosecutor Hasse]: Did she say anything about where the children were when she went to draw the bathwater?

[Edith Mihalyi]: When she went to— the children went to their room to go to bed.

[Prosecutor Hasse]: All right.

[Edith Mihalyi]: And she drew her bathwater, and that's when everything started happening, when she came out of the bathroom and saw the flames outside the window.

\* \* \* \* \* \*

[Edith Mihalyi]: Well, that she just, she was drawing her bathwater, she walked out into the room, and the way her room's facing, there's a window, and then the other room comes out. And from there the patio has come—you could see if anything was happening in there. And she saw flames. And she rushed to the baby, which its bed's right by that window.

\* \* \* \* \* \*

[Edith Mihalyi]: And she got the baby up in her arms and tried to—tried the door, couldn't get through the door, and then she went to the window and set the baby down on the floor and grabbed up the little stool that's next to her little vanity, and tossed it through the window.

And then when she reached down, the smoke had started coming in the bedroom, and she had trouble finding the baby on the floor at first, and she got the baby up and the baby and her went through the window.

The version appellant gave to the minister, Mr. Sawyer, is as follows:

[Mr. Sawyer]: —Earl Schultz and Eddie had been playing a game, I don't know whether it was cards or dominoes, they were playing a table-type game at the house most of the evening. And Schultz had said he was tired, wanted to go to bed, dismissed himself and had in fact left the room to go to bed.

And then [appellant] likewise dismissed herself, said she was going to shower—

[Prosecutor Hasse]: Said that to Eddie?

[Mr. Sawyer]: Said that to Eddie, said that she was going to bathe. I don't know whether it was shower or not. And she did go to the room, the—I've never been in the house before it was burned, but apparently it was a master bedroom suite, which is a bedroom and a bath adjacent.

Their daughter, Alisa, was in that bedroom. And she went in, checked on the daughter, went to the bathroom, began drawing water for a bath, began preparing to do so.

Was at the point of undressing, had—and I remember, for some reason I remember this, but she said that she had unfastened her pants and either unzipped or unbuttoned the Levi's or jeans that she was wearing. That sticks in my mind, because I heard her telling that twice. And she heard a noise.

I asked her to describe the noise, and I—it was something like a muffled boom, a poosh, that type of a noise, enough to alert—alarm and alert her, and she came back out of the bathroom area, went to the main part of the house, toward the main part of the house, could not open the door.

She has no—she had no idea then, as she expressed to me, why that door would not open. It was as if it were locked, but she couldn't—she—when she expressed to me, she said, "I can't imagine that would be locked, because if it was locked it would be locked from the inside." But at any rate, she could not—she expressed to me she could not open that door into the main part of the house.

She began to get alarmed about that and then she looked and she could see out the back window of the bedroom, which looks out towards what was the pool, it's on the—it faces the same direction that the living area windows do, and she could see—and I'm not sure about this, either—the reflection of flames off the pool or could actually see the flames on that end of the house.

Quite alarmed then, she began to try to figure out how she was going to get out of the house. She couldn't go that way because the flames were intense, there was a window on the opposite side of the room and smoke was now coming into the room, it was getting quite smoky.

She went over there, picked up Alisa, tried to get out the window, tried to open the window, found that it was stuck, locked, whatever, she could not get out

that window. Set Alisa down and picked up something, a stool or something, I forget what the object, picked up some object and broke the window, and then reached for Alisa and Alisa had gotten away from her.

She could not immediately get ahold of Alisa and became quite panicky about that, but did locate Alisa in the smoke, darkness, and she and Alisa exited, literally threw themselves, she threw herself and Alisa out the window, came around to the front.

■ A person commits arson if he starts a fire or causes an explosion with intent to destroy or damage any building, habitation or vehicle under six specified circumstances. TEX. PENAL CODE ANN. § 28.02 (Vernon Supp.1987). The six circumstances are:

(1) knowing that it is within the limits of an incorporated city or town;

(2) knowing that it is insured against damage or destruction;

(3) knowing that it is subject to a mortgage or other security interest;

(4) knowing that it is located on property belonging to another;

(5) knowing that it has located within it property belonging to another; or

(6) when he is reckless about whether the burning or explosion will endanger the life of some individual or the safety of the property of another.

TEX. PENAL CODE ANN. § 28.02(a)(1)–(6) (Vernon Supp.1987). In pertinent part, the indictment alleged that appellant:

[Did] unlawfully, then and there, intentionally and knowingly start a fire, to-wit: by manner and means unknown to the Grand Jury, with the intent to destroy and damage a habitation knowing that the said habitation was within the limits of an incorporated city and town, to-wit: the incorporated city of Rowlett, Texas, and the Defendant started said fire and was reckless about whether the burning would endanger the life of some individual.

Thus, the State alleged violations of section 28.02(a)(1) and (6). The State, however, fails to point out where it proved that Rowlett, Texas, was an incorporated city or town and where it proved that the habitation at 8506 Chesham in Rowlett, Texas, was located in the incorporated city or town of Rowlett, Texas. We must have citation to the record. This court should not be expected to leaf through a voluminous record hoping to find the matter raised by the State or by appellant and then speculate whether it is that part of the record to which the State or appellant has reference. *See Cook v. State*, 611 S.W.2d 83, 87 (Tex.Crim.App.1981). Hence, we conclude that the State failed to prove that appellant committed an offense under section 28.02(a)(1). Nevertheless, the question remains whether the State proved that appellant committed an offense under section 28.02(a)(6). In the present case, the elements to be proved under section 28.02(a)(6) are: (1) a person (2) starts a fire (3) with the intent to damage or destroy the habitation (4) when he is reckless about whether the burning will endanger the life of some individual. *See Miller v. State*, 566 S.W.2d 614, 618 (Tex.Crim.App.1978). We conclude that the evidence proves these four elements. We reach this conclusion because the only reasonable hypothesis to be drawn from the evidence, albeit circumstantial, is that appellant intentionally and unconcernedly started the fire which consumed her home and which took four lives.

Motive and opportunity alone are not sufficient to establish that an accused set fire to a building. There must be some testimony showing that the fire was of incendiary origin—that is, that someone intentionally burned the building. *Massey*, 226 S.W.2d at 859. In the present case, there is ample evidence that the fire was of incendiary origin. Thus, we do not have a case in which motive and opportunity stand alone. Consequently, we conclude that motive and opportunity may be considered by the jury to establish that appellant set fire to her home. As to motive and opportunity, the jury heard of appellant's dissatisfaction with her sex life, appellant's dissatisfaction with the fact that Eddie "wouldn't let her go anywhere," appellant's efforts to conceal her bills and credit union statements from Eddie, Eddie's tight money attitudes, Eddie's efforts to know appellant's financial affairs, appellant's suspicion that there was another woman, Eddie's objection to appellant's desired plastic surgery, Eddie's efforts to obtain appellant's certificate of deposit during the night of the fire and evidence that appellant was present in the house at the time of the fire.

In addition to motive and opportunity, through the other evidence, the jury heard of a neighborhood containing many dogs who were not barking, presumably at strangers, on the night of the fire. The jury heard that appellant's house was guarded by a good watchdog. The jury heard that the firefighter who went to the back of the house had to break the padlock to get the gate open. The jury heard that appellant went barefooted in the house, yet on the night of the fire she escaped wearing cowboy boots. The jury heard that appellant asked only for her "babies" on the night of the fire and not for Eddie. The jury heard that appellant wore her jewelry constantly, but was not wearing much jewelry after escaping the fire. Concerning appellant and her jewelry, the jury also heard that appellant was wearing her jewelry in the hospital and at the time of her arrest. The jury heard that appellant had a "flash" burn on her arm. The jury heard that the palms of appellant's hands were not burned though the hot bedroom door handle would have burned bare skin. The jury heard of a "burglary" and evidence indicating that appellant concocted the false burglar sighting. The jury heard that appellant's highly prized sports car was in the driveway at the time of the fire and had been loaded by two unidentified women days before the fire. The jury heard that the ignition key to appellant's automobile was undamaged by the fire. The jury heard that, on leaving the funeral home, appellant remarked to a friend, "I didn't mean it to be like this." The jury heard that appellant had been a party to transferring funds from Eddie's bank accounts into appellant's Safeway Credit Un-

ion account. The jury heard inconsistencies in appellant's statements about the fires to various witnesses. The jury heard that Earl and the girls had gone to bed before appellant left Eddie in the dining room to take her bath. Indeed, the jury heard one of appellant's versions of the fire to place Eddie standing on his feet and on fire, when evidence from investigators indicated that Eddie was drunk and passed out on the dining-room floor throughout the fire. The jury heard that Eddie was an alcoholic who often drank until he passed out cold and could not be awakened. The jury heard that appellant had been drinking with Eddie shortly before the fire. Consequently, we conclude that in the present case any rational trier of fact could have found the essential elements of arson from the evidence beyond a reasonable doubt. Moreover, we conclude that, in the present case, any rational trier of fact could have found that appellant was the person who started the fire. We reason that the cumulative force of all the incriminating circumstances was sufficient for the jury, as the trier of fact, to decide, as they did, that appellant was guilty beyond a reasonable doubt of the offense with which she was charged. *See Vaughn*, 607 S.W.2d at 921. We conclude, therefore, that the evidence was sufficient to connect appellant to the fire. We overrule appellant's first point of error.

### An Inference Based Upon an Inference

Motive and opportunity alone, are not sufficient to establish that an accused set fire to a building. There must be some testimony showing that the fire was of incendiary origin—that is, that someone intentionally burned the building. Proof, merely, that the building burned is not sufficient to show that the fire was of incendiary origin. *Massey*, 226 S.W.2d at 859. Thus, appellant bases her inference-upon-an-inference argument upon *Massey*. Where the State's case depends upon the indulgence of the inference that inflammable liquids were poured on the floor of the building just before the fire, and upon that inference the further inference is indulged that such showed an incendiary or willful

burning of the building, the State's case rests upon an impermissible inference based upon an inference. *See Massey*, 226 S.W.2d at 860.

 We conclude that the present case is distinguishable from *Massey*. We reach this conclusion because in the present case there is absent the first inference found in *Massey*. Thus, in the present case, the indulgence of the inference that inflammable liquids were poured on the floor just before the fire is missing. We quote *Massey*:

It appears undisputed that the fire originated in the kitchen, or rear, of the building. It did not originate in that portion of the building where Smith found the evidence that an inflammable liquid had been used. *There is no testimony showing that at the time of the fire any person detected, by smell or otherwise, that any inflammable fluid had been used in the building or that portion where the fire originated.*

We have searched this record in vain for any testimony showing that the burned building was in the same condition at the time Smith made his examination as it was immediately after the fire. For the burned places on the floor, as described by the witness and upon which he based his opinion, to be of any probative value they must of necessity have been the result of the fire upon which this prosecution is based.

*Massey*, 226 S.W.2d at 859–60 (emphasis added). In the present case, we conclude that firefighter Harris's testimony showed that at the time of the fire he detected that an accelerant had been used in the house and in that portion of the house where fire originated. Hence, in the present case, testimony, and not inference, established that at the time of the fire inflammable agents had been used in the habitation and in that portion of it where the fire originated. Indeed, we read appellant's brief to concede as much. Appellant tells us in her brief that the State "proved that the State's witnesses determined the day of the fire and subsequently confirmed that the fire was started by the accelerant gas-

oline." Absent *Massey's* first inference, we conclude that the State's case does not rely upon an inference based upon an inference. It follows that the trial court did not allow the State to prove the elements of arson by relying upon an inference based upon an inference. We overrule appellant's second point of error.

### That the Manner and Means Was Unknown to the Grand Jury

The indictment alleged that appellant did "intentionally and knowingly start a fire, to wit: by manner and means unknown to the Grand Jury." Appellant maintains that "the State knew and the Grand Jury could have determined that the fire was started with the use of the accelerant gasoline." Thus, appellant argues that the grand jury was required to allege that the fire was started by the accelerant gasoline and that the State failed to prove the "unknown" allegation in the indictment. In this connection, appellant points to a grand juror's testimony that the prosecutor had told the grand jury that gasoline was used in the fire.

We begin by noting that on appeal appellant does not challenge the form and substance of the indictment. The record reflects that, in the trial court, appellant filed her exceptions to the form and substance of the indictment in which appellant sought that the indictment be dismissed or quashed. The record reflects that appellant failed to obtain the trial court's ruling on her exceptions, including her motion to dismiss or quash the indictment. Therefore, we do not read appellant's brief to complain of collateral estoppel or double jeopardy exposure that might arise from a subsequent prosecution for the same offense. Furthermore, we do not read appellant's brief to complain of want of notice of the offense with which she was charged. In an arson case under section 28.02, an appellant's motion to quash entitles him to the allegation of facts sufficient to bar a subsequent prosecution for the same offense and sufficient to give him precise notice of the offense with which he was charged. *Castillo v. State,* 689 S.W.2d 443, 449 (Tex.Crim.App.1984). Instead, we read appellant's third point of error and argument to contend that the evidence is insufficient to prove that the manner and means of starting the fire was unknown to the grand jury.

Allegation of manner and means of "starting a fire" under section 28.02 is not a fundamental requisite of charging the offense for purposes of invoking the trial court's jurisdiction. *Castillo,* 689 S.W.2d at 449. Nevertheless, the State refers us to *McIver v. State,* 555 S.W.2d 755 (Tex. Crim.App.1977). The State recognizes that the rule stated in *McIver* is applicable in the present case in light of appellant's challenge to the sufficiency of the evidence to sustain the conviction on the basis of a material variance between the indictment and the proof as to the manner and means of starting the fire. We quote the rule in *McIver:*

> When an indictment alleges that the deceased was killed "by some means, instrument, and weapon, to the grand jury unknown," it is incumbent upon the State to prove that the grand jury, *after efforts to do so,* was unable to find out the kind and character of weapon or instrument used. No such proof was offered in the instant case. Under our prior decisions, such failure constitutes reversible error.

*McIver,* 555 S.W.2d at 756 (emphasis added). The State argues, however, that they have met their burden of proof as to the "unknown." The State's argument centers on the "manner and means" of *ignition* of the accelerant gasoline. The State focuses on "ignition" as against "accelerant" in its brief as follows:

> In the case at bar, it is true, as Appellant recognizes in her brief, that several witnesses testified as to the presence of an accelerant, most probably gasoline, used to enhance the fire. This merely established the incendiary nature of the fire; it did not establish how the fire started.

Thus, we read the State's brief to draw a distinction between *enhancing* the fire with gasoline and *igniting* the fire with items such as matches, cigarette lighters, blow torches or flint rock. In the State's

words: "Since no source of *ignition* was found, the actual manner and means of starting the fire was clearly unknown to the Grand Jury which returned the indictment in this case at bar." (Emphasis added.) To prove that the manner of "ignition" was the "unknown" to which the grand jury referred, the State directs us to the testimony of grand juror Page. In reading the testimony, know that Mr. Hasse is both the prosecutor at trial and the only witness before the grand jury.

[Prosecutor Hasse]: And you were present when the testimony was heard on that case?

[Page]: Yes, I was.

[Prosecutor Hasse]: And I testified in that case; is that correct?

[Page]: Yes.

[Prosecutor Hasse]: All right. Would you briefly explain to the jury the type of testimony that you heard relating to the manner and means of starting a fire being unknown?

[Page]: Well, you, as I recall, came to the grand jury and explained the case to us and explained that it had—you were looking for a reindictment and that—why you had not had an indictment before or whatever, and that—

\* \* \* \* \* \*

[Page]: Let me start again. You explained to us that certain research is necessary in an arson case, *and you gave us some background on arson and gave us the testimony or findings of three different experts as to the fact that—*

[Prosecutor Hasse]: Be a fire department expert, an insurance investigator expert, and an ATF expert?

[Page]: That is correct.

[Prosecutor Hasse]: All right. And what else?

[Page]: And said that the—what caused the fire could be determined, *but how it was ignited or started was impossible to—to determine.*

[Prosecutor Hasse]: All right. Did the grand jury ask questions?

[Page]: Yes, we did.

[Prosecutor Hasse]: All right. And was it the grand jury's understanding that the house has since been—was leveled prior to the time y'all heard the case, and therefore no further investigation was possible?

[Page]: That is correct.

[Prosecutor Hasse]: Did you feel that that testimony was an exercise of due diligence in finding the cause?

\* \* \* \* \* \*

[Page]: Repeat that, please.

[Prosecutor Hasse]: Did you feel that what the grand jury had heard, the summary of the available experts, was an exercise of due diligence by the grand jury in determining manner and means unknown to the grand jury as to starting the fire?

[Page]: Yes. As a matter of fact, this was one of our first arson cases, and as I recall we asked quite a few questions.

[Prosecutor Hasse]: All right. And in addition, if you had felt that additional information had been necessary or you had felt that additional witnesses had been necessary, what would you have done?

[Page]: We would have agreed to hold the case over and call further witnesses.

[Prosecutor Hasse]: And did you do that?

[Page]: Which we do on occasion.

[Prosecutor Hasse]: Did you do that in this case?

[Page]: No, we did not. We felt that the information that we heard was sufficient to indict.

[Prosecutor Hasse]: All right. Did you feel, based upon the evidence presented to you, the summary of other expert testimony, that additional investigation would have been fruitful in finding the manner and means of starting the fire?

[Page]: Did you think further investigation would have been fruitful?

[Prosecutor Hasse]: Do you think—

[Page]: No, we did not. We felt that the—that sufficient investigation had been done.

(Emphasis added.) Hence, the State insists that it proved that "exactly what started the fire" or the "exact starting cause of the fire" was unknown to the grand jury.

■■■ In the present case, we agree that the State's distinction between enhancing the fire and igniting the fire is valid. Therefore, we conclude that the grand jury, in refering to the "unknown" was alleging that the manner and means of ignition was unknown. Thus, we state the applicable rule by paraphrasing *McIver:* When an indictment alleges that the appellant did intentionally and knowingly start a fire, to wit: by manner and means unknown to the grand jury, it is incumbent upon the State to prove that the grand jury, *after efforts to do so*, was unable to find out the kind and character of the item used to ignite the fire. *See McIver,* 555 S.W.2d at 756. Thus, having accepted the State's theory that the grand jury, in referring to the "unknown," alleged that the manner and means of ignition was unknown, we return to consider appellant's contention that the evidence was insufficient to prove that the manner and means of starting the fire was unknown to the grand jury. The State's theory accepted, we conclude that the State's evidence was not at variance with the "unknown" allegation in the indictment. From Page's testimony, we learn that prosecutor Hasse told the grand jury that it could not be determined what item was used to ignite the fire. Furthermore, we know from Page's testimony that prosecutor Hasse "gave [the grand jury] the testimony or findings of three different experts as to" that fact. Hence, we reach the question of whether Page's testimony was sufficient to prove that the grand jury, after efforts to do so, was unable to find out the kind and character of the item used to ignite the fire.

The role of the grand jury as an important instrument of effective law enforcement necessarily includes an investigatory function with respect to determining whether a crime has been committed and who committed it. *Branzburg v. Hayes,* 408 U.S. 665, 701, 92 S.Ct. 2646, 2667, 33 L.Ed.2d 626 (1972). To this end it must call witnesses, in the manner best suited to perform its task. *Branzburg,* 408 U.S. at 701, 92 S.Ct. at 2667. A grand jury investigation is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed. *Branzburg,* 408 U.S. at 701, 92 S.Ct. at 2667. It is only after the grand jury examines the evidence that a determination of whether the proceeding will result in an indictment can be made. *Branzburg,* 408 U.S. at 701–02, 92 S.Ct. at 2666–67. Without thorough and effective investigation, the grand jury would be unable either to ferret out crimes deserving of prosecution, or to screen out charges not warranting prosecution. *United States v. Sells Engineering, Inc.,* 463 U.S. 418, 424, 103 S.Ct. 3133, 3138, 77 L.Ed.2d 743 (1983).

The grand jury has always occupied a high place as an instrument of justice in our system of criminal law—so much so that it is enshrined in the Constitution. *Sells Engineering,* 463 U.S. at 423, 103 S.Ct. at 3137. The grand jury is an English institution brought to this country by the early colonists and incorporated in the Constitution by the Founders. *Costello v. United States,* 350 U.S. 359, 362, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956). There is every reason to believe that our constitutional grand jury was intended to operate substantially like its English progenitor. *Costello,* 350 U.S. at 362, 76 S.Ct. at 408. The basic purpose of the English grand jury was to provide a fair method for instituting criminal proceedings against persons believed to have committed crimes. *Costello,* 350 U.S. at 362, 76 S.Ct. at 408. Grand jurors were selected from the body of the people and *their work was not hampered by rigid procedural or evidentiary rules. Costello,* 350 U.S. at 362, 76 S.Ct. at 408. In fact, grand jurors could act on their own knowledge and *were free to make their presentments or indictments on such information as they deemed satisfactory. Costello,* 350 U.S. at 362, 76 S.Ct. at 408. Despite its broad power to institute criminal proceedings the grand jury grew in popular favor with the years. *Costello,* 350 U.S. at 362, 76 S.Ct. at 408. It ac-

quired an independence in England free from control by the Crown or judges. *Costello*, 350 U.S. at 362, 76 S.Ct. at 408. Historically, the grand jury has been regarded as a primary security to the innocent against hasty, malicious and oppressive persecution; it serves the invaluable function in our society of standing between the accuser and the accused to determine whether a charge is founded upon reason or was dictated by an intimidating power or by malice and personal ill will. *Branzburg*, 408 U.S. at 687 n. 23, 92 S.Ct. at 2659 n. 23. The grand jury's historic functions survive to this day. Its responsibilities continue to include both the determination whether there is probable cause to believe a crime has been committed and the protection of citizens against unfounded criminal prosecutions. *United States v. Calandra*, 414 U.S. 338, 343, 94 S.Ct. 613, 617, 38 L.Ed.2d 561 (1974); *Branzburg*, 408 U.S. at 686–87, 92 S.Ct. at 2659–60. The grand jury's operation generally is *unrestrained by the technical procedural and evidentiary rules* governing the conduct of criminal trials. *Calandra*, 414 U.S. at 343–44, 94 S.Ct. at 617–18.

The grand jury occupies a similarly high place of importance in the Texas system of justice as it does in the federal system as stated by the Supreme Court of the United States. Indeed, each of the pronouncements by the United States Supreme Court are as true of the Texas grand juries as they are of federal grand juries. *Whittington v. State*, 680 S.W.2d 505, 512 (Tex. App.—Tyler 1984, pet. ref'd). The integrity and independence of our grand jury system must be protected from unwarranted intrusion by the prosecutor. *See Whittington*, 680 S.W.2d at 512. Under Texas law, the grand jury has the authority to conduct their own investigations, to subpoena evidence and witnesses, to fail to return indictments sought by the district attorney, and to indict on matters as to which the district attorney has presented no evidence and sought no indictment. *Smith v. Hightower*, 693 F.2d 359, 368 n. 21 (5th Cir. 1982). They summon witnesses and the like *and determine for themselves whether there are sufficient facts to justify an* *indictment*. *Barnes v. State*, 134 Tex. Crim. 461, 116 S.W.2d 408, 409 (1938). *See* TEX.CODE CRIM.PROC.ANN. arts. 20.09–20.11 & 20.19 (Vernon 1977).

■ In light of these teachings, we conclude that Page's testimony was sufficient to prove that the grand jury, after efforts to do so, was unable to find out the kind and character of the item used to ignite the fire. We reason that the grand jury, free of technical procedural and evidentiary rules, could determine for themselves whether the information furnished by prosecutor Hasse was satisfactory as providing sufficient facts to justify the "unknown" allegation in the indictment. Therefore, we conclude that the State met its burden of proof as to the "unknown." Thus, we conclude further that the State proved that appellant did "intentionally and knowingly start a fire, to wit: by manner and means unknown to the grand jury." It follows, therefore, that there is not a material variance between the indictment and the proof as to manner and means unknown to the grand jury. *See McIver*, 555 S.W.2d at 756. Moreover, we conclude that, in the present case, any rational trier of fact could have found that the grand jury, after efforts to do so, was unable to find out the kind and character of the item used to ignite the fire. We reason that Page's testimony was sufficient for the jury, as the trier of fact, to decide, as they did, that the manner and means of starting the fire was unknown to the grand jury. We conclude, therefore, that the evidence was sufficient to prove that the manner and means of starting the fire was unknown to the grand jury. We overrule appellant's third point of error.

### The Parole Law Charge

In appellant's fourth, fifth, sixth, seventh, eighth and ninth points of error, appellant contends that the trial court committed reversible error in submitting the instructions on the law of parole during the punishment hearing (1) as these instructions failed to conform to the statutory language due to a mistaken cross-reference in the statute; (2) as these instructions

violated due process of law under the Texas and Federal Constitutions; (3) as these instructions violated appellant's right under the Texas and Federal Constitutions to be free from the application of ex post facto laws; and (4) as these instructions violated the separation of powers doctrine of the Texas Constitution. This court has addressed and rejected appellant's first, second and fourth challenges to article 37.-07 section four of the Texas Code of Criminal Procedure in *Rose v. State,* 724 S.W.2d 832 (Tex.App.—Dallas 1986, pet. granted). This court has addressed and rejected appellant's third challenge to article 37.07 section four in *Joslin v. State,* 722 S.W.2d 725 (Tex.App.—Dallas 1986, pet. granted). Consequently we find no merit in appellant's argument under these six points of error. We overrule appellant's fourth, fifth, sixth, seventh, eighth and ninth points of error.

### The Transcriptions of Tape Recordings

In her tenth point of error, appellant contends that the trial court erred in failing to order the State to produce the transcriptions of the tapes of witnesses' testimony. Appellant argues that, due to her inability to obtain transcriptions of the tape recordings of witnesses' statements, she was denied a full and effective opportunity to cross-examine witnesses. In the present case, the trial court granted appellant's motion for discovery, including a request that the State "produce all recordings and/or indicia of tape recordings in the possession of the State or to which the State ha[d] access" concerning the charges in the indictment or other activity which directly or indirectly led to the investigation of the case. Appellant does not dispute that the State provided appellant with copies of the tape recordings themselves. In fact, the record reflects that the State provided appellant with copies of tape recordings of witnesses' statements and that appellant's counsel utilized these copies of the tape recordings during cross-examination. Appellant does, however, contend that her counsel was "obviously having trouble cross-examining witnesses with only the tape[s]." Thus, appellant argues that the court should have ordered the State to produce the transcriptions of the tapes for her use.

■ We recognize that, upon a timely request to do so, the State should furnish all discoverable tapes of witnesses for purposes of cross-examination by the defense, and, if available, a transcript of that part of the statement should be provided. *Cullen v. State,* 719 S.W.2d 195, 198 (Tex.Crim. App.1986). However, at trial, appellant failed to object to the State's failure to provide her with transcriptions of the tape recordings. Appellant requested that she be provided "all recordings and/*or* indicia of tape recordings" of witnesses' statements. When the State provided appellant with copies of the tapes, it complied with the "or" portion of her request. Thus, appellant received all she had requested when the State provided her these copies. When an appellant obtained all the relief he asked for, the error, if any, was not properly preserved. *Boyd v. State,* 643 S.W.2d 700, 707 (Tex.Crim.App.1982). Moreover, appellant failed to object to the State's failure to provide written transcriptions of the tapes at trial. Error is not preserved in the absence of objection. *Esquivel v. State,* 595 S.W.2d 516, 524 (Tex.Crim.App.), *cert. denied,* 449 U.S. 986, 101 S.Ct. 408, 66 L.Ed.2d 251 (1980); TEX.R.APP.P. 52(a). We conclude, therefore, that appellant has not preserved this complaint for review by this court. *See Cisneros v. State,* 692 S.W.2d 78, 82 (Tex.Crim.App.1985).

■ For the purposes of this opinion, we assume but do not decide, that appellant has preserved error for our review. We note, however, that failure to effectuate discovery will not result in reversible error unless it can be shown that the evidence withheld would have affected the outcome of the trial in the defendant's favor. *Carmona v. State,* 698 S.W.2d 100, 105 (Tex.Crim.App.1985). In the present case, the record reflects that appellant's counsel not only reviewed the tapes the State provided him in order to structure his cross-examination but also that appellant's counsel played these tapes in the courtroom while questioning witnesses to re-

fresh various witnesses' memory. At trial, appellant complained simply that using the tapes was a "slow process." Appellant utilized the tapes at trial where he failed to object that the transcripts would contain any evidence not available on the tapes. The Constitution entitles a criminal defendant to a fair trial, not a perfect one. *Delaware v. Van Arsdell,* 475 U.S. 673, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986). We conclude that appellant's counsel thoroughly and effectively cross-examined witnesses at trial in the present case. Consequently, we conclude that appellant received a fair trial. We further conclude beyond a reasonable doubt that the error of failing to produce transcriptions for appellant's use in the present case made no contribution to appellant's conviction or punishment. *See Van Arsdell,* 106 S.Ct. at 1436–38; TEX.R.APP.P. 81(b)(2). Accordingly, we overrule appellant's tenth point of error.

### *Fire as a Deadly Weapon*

In her eleventh point of error, appellant contends that the trial court erred in submitting the issue of fire as a deadly weapon because fire is not a deadly weapon within the meaning of the statute. The trial court submitted to the jury the following instruction and special issue:

"Deadly weapon," means a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury; or anything that in the manner of its use or intended use is capable of causing death or serious bodily injury.

&ast; &ast; &ast; &ast; &ast; &ast;

Was the use of fire the use of a deadly weapon, as that term has been herein defined?

### ANSWER

We, the jury, unanimously find and determine beyond a reasonable doubt that the answer to this Special Issue is "Yes."

(Signature)

Appellant's sole objection to this part of the charge was:

[Defense Counsel]: Your Honor, we would object to any charge of aggravated in regard to the definition of fire, as feel this case is not aggravated and that the charge should not be in there in its entirety.

The State maintains that appellant failed to "[voice] a specific objection to either the charge or the special issue" and that, therefore, nothing is presented for review unless fundamental error is shown. For the purposes of this opinion, we assume, but do not decide, that defense counsel's above remarks stated a specific objection to the charge sufficient to preserve for review the contention and arguments made by appellant in and under her eleventh point of error. Appellant argues that the definition of a deadly weapon in section 1.07(a)(11)(B) of the Texas Penal Code necessarily refers to a tangible thing and, since fire is "nothing more than combustion," fire cannot be a deadly weapon. Thus, appellant insists that the trial court should not have submitted to the jury the issue of fire as a deadly weapon. Section 1.07(a)(11)(B) provides in part:

(a) In this code:

(11) "Deadly weapon" means:

&ast; &ast; &ast; &ast; &ast; &ast;

(B) *anything* that *in the manner of its use or intended use* is capable of causing death or serious bodily injury.

TEX.PENAL CODE ANN. § 1.07(a)(11) (Vernon 1974) (emphasis added).

First, we must decide whether fire is "any*thing*" within the language of section 1.07(a)(11)(B). "Fire" is defined in terms of its tangible aspects and effects— "fire" is "the phenomenon of combustion as manifested in light, flame, and heat and in heating, destroying, and altering effects." Webster's Third New International Dictionary 854 (1981). *See H. Schumacher Oil Works v. Hartford Fire Insurance Co.,* 239 F.2d 836, 837 (5th Cir.1956). Therefore, we conclude that fire is not intangible combustion, as appellant argues, but includes the tangible aspects of the combustion, light and heat, as well as its

effects. Thus, we conclude that fire may be a thing which in the manner of its use or intended use is capable of causing death or serious bodily injury.

We turn then to decide (1) whether, in the present case, fire in the manner of appellant's use or intended use of it was capable of causing death or serious bodily injury; (2) whether fire could properly be considered a deadly weapon under section 1.07(a)(11)(B); and (3) whether the court properly charged the jury concerning appellant's use of a deadly weapon. The State concedes that fire is not a deadly weapon per se. Hence, we must look to the fire's use and intended use to determine if it is a deadly weapon. *See Dominique v. State*, 598 S.W.2d 285, 286 (Tex. Crim.App.1980). The wounds inflicted by the fire are factors to be considered to determine whether it is a deadly weapon. *See Dominique*, 598 S.W.2d at 286. The most important criteria is the manner in which the weapon is used. *Dominique*, 598 S.W.2d at 286.

In the present case, the medical examiner testified that all four victims suffered fire-related injuries. The cause of death of all four victims was either thermal burns, smoke inhalation or a combination of the two. At trial, the State adduced evidence to connect appellant with starting the fire which caused four deaths. Sufficient circumstantial evidence existed to show that appellant poured gasoline in the room where her husband, Eddie, had passed out drunk and then ignited the gasoline to enhance the fire resulting in his death. We conclude that, in the present case, fire in the manner of appellant's use of it caused Eddie's death. Thus, we further conclude that fire in the manner of appellant's use of it in the present case constituted a deadly weapon within the definition set forth in section 1.07(a)(11)(B). In this connection, we note that a fire bomb or Molotov cocktail is a deadly weapon when used by one prisoner against another in a penal institution. *See Everhart v. State*, 358 So.2d 1058, 1064 (Ala.Crim.App.1978). Accordingly, we conclude that the court properly submitted to the jury the above instruction and special issue concerning appellant's use

of fire as a deadly weapon. We overrule appellant's eleventh point of error.

Affirmed.

## ADDENDUM

I write the opinion of this court in this case in light of the majority's holdings in *Rose v. State*, 724 S.W.2d 832 (Tex.App.—Dallas 1986, pet. granted). Nevertheless, I remain of the opinion that article 37.07, section four of the Texas Code of Criminal Procedure is invalid and unconstitutional for the reasons expressed in my dissent in *Rose*.