**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Charles SMILEY, Defendant–Appellant.**

**No. 92–2749.**

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 14, 1993.

Decided July 7, 1993.

Rehearing and Suggestion for Rehearing En Banc Denied Sept. 1, 1993.

James R. Wyrsch, Kansas City, MO, argued, for defendant-appellant.

Mark A. Miller, Asst. U.S. Atty., Kansas City, MO, argued, for plaintiff-appellee.

Before JOHN R. GIBSON, Circuit Judge, BRIGHT, Senior Circuit Judge, and BOWMAN, Circuit Judge.

JOHN R. GIBSON, Circuit Judge.

Charles Smiley appeals from his conviction of conspiring to import heroin in violation of 21 U.S.C. § 963 (1988), arguing that there was insufficient evidence to support the conviction. He also argues that the district court[1] erred in denying his motion in limine to exclude evidence of a prior conviction, and by including one kilogram of heroin in determining his base offense level for sentencing. We affirm his conviction and sentence.

In May 1990 Detective Jon Ciarletta,[2] a police officer assigned to the Jackson County, Missouri, Drug Task Force bought cocaine from David Jones, who got the cocaine at Dealer's Auto Fabric, a car reupholstering shop owned by Charles Smiley. Jones advised Ciarletta that he could also get white heroin from the same people who supplied the cocaine, two people he identified as "Bob" and "his boss."

Ciarletta then bought heroin several times from Jones. On a number of these buys, Ciarletta went with Jones to Dealers Auto Fabric, where Jones obtained the heroin. The heroin was white in color, the price was relatively low, and the purity level was high. Jones introduced Ciarletta to Bob Turney, who worked at Dealer's Auto Fabric, and Ciarletta began buying heroin from Turney. Turney also picked up the heroin at Dealer's Auto Fabric. Turney told Ciarletta that "his boss" set the prices, and complained that "Chuck" was the person making the profit.

Ultimately, Ciarletta came in direct contact with Smiley. On October 24, 1990, Ciarletta arranged a purchase of heroin from Turney. Turney, Smiley, and Ciarletta met at an Applebee's restaurant. The three sat at the bar, and Smiley told Ciarletta to "go outside with Bob, he's going to take care of this for you." Ciarletta left with Turney, and Turney got the heroin from Smiley's trunk. After Ciarletta paid Turney, Turney gave the money to Smiley. Another time, Smiley accepted $7,750 from Ciarletta as payment on a prior heroin sale that Ciarletta had negotiated with Turney. Ciarletta and Smiley discussed future purchases of heroin, and Smiley told him that he was having a supply problem over which he had no control. He explained that Customs had seized a significant amount of heroin from his source of supply. Smiley and Ciarletta discussed the high purity of the heroin, and Smiley said that it could be cut or adulterated six-fold. Smiley assured Ciarletta that he was going to try to get the heroin from the same persons who had supplied it in the past. There was testimony that most heroin in Kansas City had purity levels ranging from two to four percent, and that Smiley's heroin had purity levels of twenty-nine to forty percent. There was also testimony that the heroin contained traces of organic materials consistent with that originating in Southeast Asia.

The government placed a wiretap on Smiley's business phone, and recorded a conversation on February 6, 1991, in which Smiley informed an unknown male that he had to meet an in-law of his who was arriving by plane. He stated that she was an air hostess for Thai Airlines, and was coming to town for four or five hours. Smiley said that he had to pick her up and take her home. He stated "[s]he's helping me on a deal if you know what I mean." Later that day, he met Songruk Tumrongteppitux[3] at the airport and took her to his home, where she stayed about six hours.

Ciarletta telephoned Smiley several times to see whether Smiley had obtained more heroin, and on February 7, 1991, Smiley asked Ciarletta to meet with him. Ciarletta met Smiley at Dealer's Auto Fabric that same day. Smiley asked Ciarletta how many

---

1. The Honorable D. Brook Bartlett, United States District Judge for the Western District of Missouri.

2. Detective Ciarletta subsequently became a Special Agent with the D.E.A.

3. The grand jury indicted Tumrongteppitux on the conspiracy to import charge. She remains in Thailand, which has no extradition treaty with the United States.

ounces of heroin he wanted because he "paid cash," and wanted to get the exact amount to avoid "overpurchases." Ciarletta told Smiley that he wanted to buy between one-half and one kilogram of heroin. Smiley responded that his source of supply had suddenly retired, but he stated that he could get the "same stuff." He told Ciarletta that the heroin was "transcontinental," explaining that it "comes from across the seas." Smiley told Ciarletta to contact him weekly to check the status.

The next week, Smiley flew to Bangkok, Thailand and arrived there on February 15, 1991. Smiley was placed under surveillance by Thai police assigned to the office of Narcotics Control Board, who were working with D.E.A. agents stationed in Bangkok. Smiley spent a few days at the home of Tumrongteppitux, and then traveled with Mr. Sarote, his brother-in-law, to the Chiang Rai region of Thailand, which is near the Burma and Laos borders. Heroin is produced in this area and is white in color. While in Chiang Rai, Smiley traveled to a village where "mountain" people reside. This village, located in a remote region, is not a tourist area, and is known for its opium growing and heroin trafficking activities. There was testimony from Thai police officers and D.E.A. agents that the "mountain" people who reside in the villages control the production and distribution of heroin, and that these people are recognizable by their distinctive clothing. Smiley was seen having lunch with several people, including at least one "mountain" person at a town named Mae Salong. Smiley returned to Bangkok on February 21, and left Thailand for the United States on February 24.

Ciarletta telephoned Smiley on February 26, and the two met the next day at Dealer's Auto Fabric. Smiley told Ciarletta that he had just returned from Thailand, "where they actually make that shit." He told Ciarletta that the heroin comes from Burma, and that he had gone to the Golden Triangle, a place where the Laos, Burma, and Thai borders touch. He stated that there had been a coup that had toppled the government and, therefore, some of the people he wanted to

see were not there. He stated that he had "some people over there that I'm in touch with that ... are gonna get things done, but it jus' slows things way ... down and ... everybody needs to be sure over there ... whose [sic] protected." He told Ciarletta about going to territory controlled by a certain Khun Sa, whom he identified as the head opium man in the world. Ciarletta and Smiley talked about the high purity levels of the heroin, and Ciarletta stated that it was "good news" that Smiley could get "stuff right from the main guy over there." Smiley responded: "I think it was last time, I don't think it gets any better than that." He told Ciarletta that "they" do some "big business," and that "he didn't," but that he was assured that "they" would get things together and "do something," and that "they" told him "we haven't forgot ya and we like ya," and he added, "their word's good." Smiley told Ciarletta that "it's not going to be real, real soon," but it "will take place." Smiley asked Ciarletta how much he wanted, and Ciarletta told Smiley that he could "handle half of a case or a whole case." Smiley asked what he was calling a case, and Ciarletta responded "two point two." Smiley said "Oh, okay" and stated that he was "talkin (sic) about a higher price product," but could not give Ciarletta a price or delivery date.

On April 17, Smiley and Ciarletta met again. Smiley told Ciarletta that the coup in Thailand was causing difficulty in obtaining heroin, and advised him to read *The Economist* magazine, which explained the situation. Smiley never provided any heroin to Ciarletta.

Smiley was charged with conspiracy to import heroin in violation of 21 U.S.C. and § 963 (1988), conspiracy to distribute heroin in violation of 21 U.S.C. 846 (1988), and five counts of aiding and abetting the distribution of heroin in violation of 21 U.S.C. § 841(a)(1) (1988). The jury convicted him on both conspiracy counts and on four of the five distribution counts. Smiley appeals, arguing that there was insufficient evidence to support his conviction on the conspiracy to import charge,[4] and that the district court abused its

---

4. Smiley does not attack the sufficiency of evidence on his other convictions.

discretion in allowing evidence of a prior conviction and erred in sentencing.

## I.

 Smiley argues that there was insufficient evidence to support his conviction on the conspiracy to import charge. He contends that the government offered no evidence that he entered an agreement with anyone to import heroin into the United States, and therefore, the government failed to prove an essential element of the conspiracy charge. Smiley stresses that there was no evidence linking Tumrongteppitux to drugs and no showing that any heroin was ever imported into the United States, and he argues that this lack of evidence leads to a reasonable inference that no agreement to import was ever made.

 We must affirm Smiley's conviction "if, viewing the evidence in the light most favorable to the government and giving the government the benefit of all reasonable inferences, ... a reasonable fact-finder could have found guilt beyond a reasonable doubt." *United States v. Brown*, 956 F.2d 782, 785 (8th Cir.1992) (quoting *United States v. Foote*, 898 F.2d 659, 663 (8th Cir.), *cert. denied*, 498 U.S. 838, 111 S.Ct. 112, 112 L.Ed.2d 81 *and* 498 U.S. 938, 111 S.Ct. 342, 112 L.Ed.2d 307 (1990)). To prove a conspiracy to import, the government must show Smiley entered into an agreement to import heroin with at least one other person. *See United States v. Giunta*, 925 F.2d 758, 764 (4th Cir.1991). Once a conspiracy is proved, only slight evidence against a defendant which connects him to the conspiracy is needed to support a conviction. *Brown*, 956 F.2d at 785.

When the evidence we have outlined above is considered in a light most favorable to the government, we must conclude that sufficient evidence existed for the jury to find Smiley guilty of a conspiracy to import heroin. Smiley admitted to Ciarletta that he could get heroin, it would be "transcontinental," and come from "across the seas." Smiley then went to remote, heroin-producing regions in Thailand, where he met with a "mountain" person known to be involved in heroin trafficking. When he returned from Thailand, he told Ciarletta about his trip, including his visit to the territory of the "head opium man in the world," and assurances from certain people that he would be "taken care of." From this, a jury could reasonably infer that Smiley had an agreement with someone to import heroin. *United States v. Rodriguez*, 765 F.2d 1546, 1552 (11th Cir.1985) (defendant may be convicted of conspiracy with persons whose names are unknown). Further, Smiley told someone that his sister-in-law, Tumrongteppitux, a Thai national who worked as an airline stewardess, was helping him "on a deal." There was testimony that Thai flight attendants are often used as narcotics carriers. From this, the jury could reasonably infer that Smiley had an agreement to import heroin with Tumrongteppitux. *See United States v. Turpin*, 920 F.2d 1377, 1383–84 (8th Cir.1990) (evidence of agreement may be circumstantial), *cert. denied*, —— U.S. ——, 111 S.Ct. 1428, 113 L.Ed.2d 480 (1991). In addition, the heroin's high purity levels and relatively low prices would allow the jury to infer that Smiley obtained his supply directly from the source country, rather than purchasing it through an intermediary in the United States. Particularly telling is Smiley's conversation with Ciarletta, after his trip to Thailand, describing the people he was "in touch with" and stating that they are going to get "things done," that "their word's good," and while it was "not going to be real real soon, ... it will take place." Smiley may have presented defenses, but the evidence was sufficient for a jury to find guilt on the conspiracy to import charge. *See United States v. Wainwright*, 921 F.2d 833, 835 (8th Cir.1990) ("disputed testimony can be considered credible by a jury").

## II.

 Smiley next argues that the district court abused its discretion in allowing the government to impeach him by admitting a 1985 conviction for receiving stolen property. The district court denied Smiley's oral motion in limine to bar the government from using this evidence. Smiley, however, disclosed the evidence of conviction on direct

examination, attempting to "remove the sting."

We reject Smiley's argument. First, Smiley waived the issue for appeal by introducing the evidence of his conviction on direct examination. An objection to the admission of a prior conviction is not preserved for appeal when a defendant introduces the evidence during his direct examination. *Brown,* 956 F.2d at 787; *United States v. Vega,* 776 F.2d 791, 792 (8th Cir.1985); *United States v. Johnson,* 720 F.2d 519, 522 (8th Cir.1983), *cert. denied,* 465 U.S. 1036, 104 S.Ct. 1310, 79 L.Ed.2d 707 (1984). In any event, we cannot conclude that the district court abused its discretion in admitting this evidence. Although receiving stolen property is not similar to the drug charges, this case boiled down to credibility determinations, and the court did not abuse its discretion in admitting the evidence. *See Brown,* 956 F.2d at 787 (no abuse of discretion in allowing prior burglary conviction in drug conspiracy case).

### III.

Finally, Smiley argues that the district court erred in calculating his base offense level. The district court found that Smiley was responsible for 1,268.75 grams of heroin,

set his base offense level at 32 with a two-level enhancement for Smiley's managerial role, and sentenced him to 168 months.[5] *See* United States Sentencing Commission, *Guidelines Manual,* § 2D1.1(c)(6) (Nov. 1991). Smiley contends that the appropriate base offense level should be 26, since the government only proved that 268.75 grams of heroin was actually purchased, and that the district court erred by including the one kilogram amount in the sentencing calculation.

■ There is no requirement that drugs be produced as evidence in order to be counted at sentencing. *United States v. Estrada–Molina,* 931 F.2d 964, 966 (1st Cir.1991). When a defendant is convicted of conspiracy involving illegal drugs, the base offense level is to be the same as if the object of the conspiracy had been completed. U.S.S.G. § 2D1.4(a) (Nov. 1991).[6] If the conviction is for an offense "involving negotiation to traffic in a controlled substance," the "weight under negotiation in an uncompleted distribution" is to be used to determine the applicable amount of drugs, unless the trial court finds that "the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount."[7] U.S.S.G. § 2D1.4,

---

5. The district court grouped Smiley's convictions together for sentencing purposes. *See* U.S.S.G. § 3D1.2.

6. A similar provision is now contained in U.S.S.G. § 2D1.1, comment. (n. 12) (Nov. 1992).

7. Smiley did not argue to the district court that he did not intend and was not reasonably capable of producing the one kilogram amount. *Cf. United States v. Brown,* 946 F.2d 58, 60 (8th Cir.1991) (issues specifically raised). Rather, he argued to the district court that there was no evidence that he attempted or actually purchased one kilogram of heroin in Thailand.

The district court made no specific findings as to whether Smiley intended and was reasonably capable of producing the one kilogram amount. Smiley does not argue on appeal that the district court erred by failing to make these findings. Smiley does argue generally that there is no evidence that he was reasonably capable of producing the one kilogram amount, but his argument on appeal, as in the district court, is that there was no evidence that he agreed to import or distribute the one kilogram amount.

There is conflict among the circuits as to whether § 2D1.4 requires the district court to make specific findings that the defendant intend-

ed and was reasonably capable of producing the negotiated amount. The Sixth Circuit recently held that the district court must make such specific findings in *United States v. Gessa,* 971 F.2d 1257, 1265 (6th Cir.1992) (en banc). *Accord United States v. Jacobo,* 934 F.2d 411, 416 (2d Cir.1991).

This court has not specifically addressed the question, although we implicitly rejected this requirement in *United States v. Adipietro,* 983 F.2d 1468, 1472 (8th Cir.1993). *See also United States v. Edwards,* 994 F.2d 417, 423 (8th Cir.1993) (district court not required to make specific finding of reasonable foreseeable quantities absent specific challenge by defendants). In two other recent cases, we discussed the specific findings of intent and ability to consummate the transaction under § 2D1.4, but it was clear in those cases that the defendants raised the issues in the district court. *See United States v. Nichols,* 986 F.2d 1199, 1204–06 (8th Cir.1993); *United States v. Lewis,* 987 F.2d 1349, 1355 (8th Cir.1993).

There is also disagreement among the circuits as to who bears the burden of proving defendant's intent and ability to produce the negotiated amount. We have held a number of times that the defendant has the burden of establishing the applicability of a factor that would reduce his

comment. (n. 1) (Nov. 1991).[8] *See United States v. Riascos,* 944 F.2d 442, 445 (8th Cir.1991); *United States v. Foley,* 906 F.2d 1261, 1265 (8th Cir.1990).

 The sentencing guidelines and our case law authorize the district judge to determine the quantity of drugs based on reliable evidence. *United States v. Simmons,* 964 F.2d 763, 772–73 (8th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 632, 121 L.Ed.2d 563 (1992); *United States v. Lawrence,* 915 F.2d 402, 408–09 (8th Cir.1990). The government bears the burden of proving by a preponderance of the evidence the quantity of drugs involved, and the district court's determination of the quantity of drugs is a question of fact that we review under the clearly erroneous standard. *United States v. Pou,* 953 F.2d 363, 371 (8th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 1982, 118 L.Ed.2d 581 (1992).

 The government responds that proof of the one kilo amount is shown in a February 27 conversation between Ciarletta and Smiley. During that conversation, Smiley and Ciarletta discussed Smiley's trip to Thailand, the risks of bringing drugs into the United States, and drug interdiction techniques. Smiley then changed the topics of conversation to ask Ciarletta how much heroin he wanted. The relevant portion of the recorded conversation is as follows:

> Smiley: As it stands right now what do you think you want?
>
> Ciarletta: Well, ... I don't know what uh, I was just gonna guess on what kind of price you're gonna charge, but I, I know I

could handle half of a case or a whole case. I, I'm confident that I think ...

> Smiley: What're you callin' a case?
>
> Ciarletta: Two point two.
>
> Smiley: Oh, okay.

Smiley says this conversation only establishes that he agreed that "2.2" means a kilo. He argues that he never agreed to sell one kilogram to Ciarletta, and he stresses that the two never agreed to a price or delivery date. He argues that he cannot be sentenced for the kilogram amount as that amount was not "under negotiation" as required by § 2D1.4. He contends that the circumstances here are similar to those in *Foley,* in which this court reversed the trial court's finding that the defendant "negotiated" the sale of two ounces of cocaine. 906 F.2d at 1265.

Certainly the statement in the February 27 recorded conversation may be read either as Smiley's agreement to a definition of what a case is or as Smiley's agreement to produce heroin. The district court had the obligation to weigh this conversation under a preponderance of the evidence standard, and we cannot conclude that the district court clearly erred by including the one kilogram in computing Smiley's base offense level. *See Lawrence,* 915 F.2d at 408 ("under the clearly erroneous standard, an appellate court may reverse only when on the entire evidence [it] is left with the definite and firm conviction that a mistake has been committed") (quoting *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)). The conversation must

---

sentence. *See, e.g., United States v. Morales,* 923 F.2d 621, 628–29 (8th Cir.1991). *See also United States v. Urrego–Linares,* 879 F.2d 1234, 1238–39 (4th Cir.) (defendant has burden of establishing applicability of factor that would lower his sentence), *cert. denied,* 493 U.S. 943, 110 S.Ct. 346, 107 L.Ed.2d 334 (1989); *United States v. Wyckoff,* 918 F.2d 925, 928 (11th Cir.1990) (same). Other circuits have specifically held that the defendant carries the burden of proving that he did not intend and was not reasonably capable of producing the negotiated amount. *See, e.g., United States v. Christian,* 942 F.2d 363, 368 (6th Cir.1991) ("once the government satisfies its burden in establishing a negotiated amount, the defendants have the burden of proving that they were not capable of producing that amount"), *cert. denied,* —— U.S. ——, 112 S.Ct. 905, 116

L.Ed.2d 806 (1992); *United States v. Barnes,* 993 F.2d 680 (9th Cir.1993) (same). *See also United States v. Monroe,* 943 F.2d 1007, 1019 (9th Cir. 1991) (indicating that defendant bears burden of proof), *cert. denied,* —— U.S. ——, 112 S.Ct. 1585, 118 L.Ed.2d 304 (1992). *But see Gessa,* 971 F.2d at 1262–67 (government has burden of proving defendant intended to produce and was reasonably capable of producing negotiated amount); *United States v. Reyes,* 930 F.2d 310, 315 (3d Cir.1991) (same); *United States v. Ruiz,* 932 F.2d 1174, 1184 (7th Cir.) (same), *cert. denied,* —— U.S. ——, 112 S.Ct. 151, 116 L.Ed.2d 116 (1991).

8. This provision is now contained in U.S.S.G. § 2D1.1, comment. (n. 12) (Nov. 1992).

not be read in a vacuum. Ciarletta also testified at trial that Smiley asked to meet him on February 7, 1991. The two met, and Smiley asked Ciarletta how much heroin Ciarletta wanted because he had to pay cash and he did not want any "overpurchases." Ciarletta said that he wanted a half kilo to a kilo. Although Smiley told Ciarletta that his source had retired, the two discussed heroin trafficking, and Smiley told Ciarletta that the heroin was "transcontinental," and came from "across the seas." About one week later, Smiley went to Thailand, and traveled to an area where heroin is produced. When Smiley returned from Thailand, he told Ciarletta about his trip, and explained the delays caused by the military coup. Nevertheless, he assured Ciarletta that people in Thailand had told him that they could get heroin, and that "it will take place." The two also discussed heroin trafficking, including drug interdiction techniques, and Smiley turned the conversation to Ciarletta's quantity desires, specifically asking Ciarletta how much heroin he wanted. Although the two never agreed to price or a delivery date, Smiley stated that he was "talking about a higher price product."

This testimony was further bolstered at Smiley's sentencing hearing when Ciarletta testified that Smiley agreed to provide him with one kilogram of heroin, and that the only problem was an exact price and delivery date. In *Foley*, we held that the defendant's answer to an undercover agent's single inquiry as to the price for two ounces of cocaine did not support a finding that "negotiation for another sale took place." 906 F.2d at 1264. There is more evidence here than in *Foley*. The one kilogram amount came up on two occasions, and was in the context of quantity discussions initiated by Smiley. Smiley explained that he needed to know exactly how much heroin Ciarletta wanted to avoid "overpurchases." After Ciarletta stated that he wanted one kilogram, Smiley told him about the delays, but assured Ciarletta that the deal "will take place." The one kilogram amount was not an "offhand statement," *Ruiz*, 932 F.2d at 1184, or a simple "response to the agent's ... question about cost." *Foley*, 906 F.2d at 1265. Indeed, Smiley asked Ciarletta how much heroin he

wanted, and represented that he could get the heroin. There was sufficient evidence to support the district court's quantity determination.

We affirm Smiley's conviction and sentence.

BRIGHT, Senior Circuit Judge, dissenting.

I dissent. The sentencing decision in this case is unsupported by the evidence and rests on surmise and conjecture. In calculating Smiley's sentence, the district court judge included a kilo of heroin which Smiley never produced, delivered or possessed and for which, as the majority observes, *supra*, at 481–82, he never negotiated a price or delivery date.

How did the additional kilo enter into the sentence? The determination to include the kilo in sentencing derives from the following recorded conversation between Smiley and DEA Agent Ciarletta:

CIARLETTA: Yeah. Humph. Well uh, woul-, I guess you don't know about how much? You gonna be able to, able to give me at time? You don't anything about that, huh.

SMILEY: I don't know anything.

CIARLETTA: Yeah. Well, shoot, I guess I ...

(interrupts)

SMILEY: As it stands right now what do you think you want?

CIARLETTA: Well, I'll tell ya, uh, I don't know what uh, I was just gonna guess on what kind of price you're gonna charge, but I, I know I could handle half of a case or a whole case. I, I'm confidant that I think ...

(overlapping conversation)

SMILEY: What're you callin' a case?

CIARLETTA: Two point two.

SMILEY: Oh, okay.

CIARLETTA: So uh, an I uh, I'm uh confidant of that, and uh, like say cus as far as uh, ya know, the Cain business goes, I mean that's uh, that's normally

the, we be doing case lots, at least one or two. Between my cousin and mine we, we try to get two to four and that's how you make money, you gotta get 'em, ya know.

SMILEY: Hell, the margin's there's a lot different I understand that ya gotta ...

CIARLETTA: Yeah. I know, I know I can afford it, four, ya know.

SMILEY: You're talkin' about a higher price product than you are with ...

CIARLETTA: Oh hell yeah. That's uh, that's uh, I'm pretty confident I can do one and ya know, you, you'll have to get with me and we'll have to discuss exactly what, how much and everything. But I'm ...

SMILEY: I don't know that either.

CIARLETTA: Yeah. Well we'll, ya know, there'll be time, so ... whenever.

SMILEY: I'm assuming, ya know if everything, uh, ahh ... ya know, I'm trying to guess, because there's nothing I can do about it anyway.

CIARLETTA: Yeah.

. . . . .

Addendum to Appellee's Br. at A20–21 (Govt. Exhibit 40–A). The only agreement I can decipher from this garbled conversation is that a "case" is "two point two."

To include the kilo in calculating Smiley's sentence, the district court needed to determine Smiley intended to produce and could produce "the weight under negotiation in an uncompleted distribution." U.S.S.G. § 2D1.4, comment. (n. 1) (Nov. 1991); *see also United States v. Brown*, 946 F.2d 58, 61 (8th Cir.1991). Ciarletta's statement that he thought Smiley agreed to supply one kilogram is not proof of the fact, particularly when the actual words of the conversation belie any such subjective conclusion. In my

opinion, the district court lacked a reasonable basis to find Smiley had an intent to produce the additional kilo.

The effect of including the extra kilo in sentencing Smiley is substantial. Following the probation officer's recommendation, the sentencing judge sentenced Smiley based on 1,268.75 grams of heroin, calculating a base offense level of 32 plus 2 for his role in the offense. He sentenced Smiley to 168 months, at the bottom of the 168 to 210 month sentencing range. If Smiley had been sentenced based on 268.75 grams, his base offense level would have been 26 plus 2 for his role in the offense, for a sentencing range of 87 to 108 months. Assuming a new sentence at the bottom of the range, Smiley would have received a sentence of eighty-seven months rather than 168 months, or nearly half the time of the sentence he received.

This case presents another example of what I perceive to be the unfairness that can arise from guideline sentencing in which no rules of evidence apply and in which the sentencing judge often summarily approves the sentencing recommendations of the probation officer.

In the past, this writer has suggested that sentences imposed under the guidelines often seem to come from an *Alice in Wonderland* world where "up is down and down is up." *United States v. Galloway*, 976 F.2d 414, 438 (8th Cir.1992) (Bright, J., dissenting), *cert. denied*, —— U.S. ——, 113 S.Ct. 1420, 122 L.Ed.2d 790 (1993). When it comes to proof of facts undergirding guideline sentences, the principle courts often apply is that "Anything Goes." [1]

In the instant case, a statement to Smiley that a "case" is "two point two" should not imply an agreement by Smiley to supply that

---

1. The title song of the Broadway musical "Anything Goes," music and lyrics by Cole Porter, observes, in part:

The world has gone mad today
And good's bad today,
And black's white today,

quantity. In my opinion, it was clearly erro-neous to find otherwise.

Accordingly, I dissent from the sentence.[2]

And day's night today,

. . . . .

Anything goes.

2. I can find no proof of a conspiracy unless the government agent is an unindicted conspirator—

a claim not made by the prosecutor. Neverthe-less, I do not further discuss the issue because the conspiracy conviction without a proven quantity will add no additional prison time to the guideline sentence applicable to the distribution count, which is unchallenged on appeal.