**STATE of Missouri, Respondent,**

v.

**Sandra IDLEBIRD, Appellant.**

**No. WD 49259.**

Missouri Court of Appeals,
Western District.

March 21, 1995.

As Modified May 2, 1995.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 2, 1995.

**Christopher BARBER, Appellant,**

v.

**STATE of Missouri, Respondent.**

**No. 66597.**

Missouri Court of Appeals,
Eastern District,
Division One.

March 14, 1995.

Before REINHARD, P.J., and GARY M. GAERTNER and CRAHAN, JJ.

## ORDER

Susan M. Hunt, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Jefferson City, Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before FENNER, C.J., P.J., and HANNA and LAURA DENVIR STITH, JJ.

LAURA DENVIR STITH, Judge.

Defendant Sandra Idlebird was convicted of first degree assault, § 565.050, RSMo 1986, and armed criminal action, § 571.015, RSMo 1986.[1] The jury found she set fire to the bed in which her husband's two year old daughter, Brittainy, was sleeping, causing Brittainy serious physical injury. Defendant appeals her conviction on the grounds that: (1) there was insufficient evidence to sustain

---

1. All references to statutes are to RSMo 1986 unless otherwise indicated.

her conviction; (2) it was plain error to admit evidence of her prior conviction for assault in the Netherlands for impeachment purposes; (3) it was error to convict her of armed criminal action because fire does not constitute a dangerous instrumentality within the meaning of the armed criminal action statute; (4) criticism of her attorney by the trial judge during Kerry Idlebird's cross-examination was prejudicially improper; and (5) she was denied due process by the cumulative effect of the above errors committed during the trial. We find no reversible error and affirm both convictions.

## I. *FACTUAL AND PROCEDURAL BACKGROUND*

Defendant dated Kerry Idlebird sporadically from 1982 until early 1986, while the two of them both resided in Texas. They temporarily ended their relationship upon Mr. Idlebird's relocation to Kansas City in 1986, but recommenced it in 1988, although Defendant still resided in Texas.

In mid–1989, while involved in this long-distance relationship with Defendant, Mr. Idlebird briefly also became involved with Thressa Allen, a co-worker. Ms. Allen became pregnant and, in August 1989, informed Mr. Idlebird of the pregnancy. Mr. Idlebird initially questioned his paternity of the child and encouraged Ms. Allen to get an abortion. She did not do so. Mr. Idlebird did not continue the relationship with Ms. Allen, but rather, in December 1989, he became engaged to Defendant. They set their wedding for the following November. He did not tell Defendant about Ms. Allen's pregnancy.

Ms. Allen gave birth to the child, Brittainy, in April of 1990. Mr. Idlebird learned of Brittainy's birth shortly thereafter but did not tell Defendant about Brittainy until August 1990. Defendant was upset by this news, but agreed to go through with the marriage in November 1990 as planned. Initially, Mr. Idlebird did not seek visitation with Brittainy. However, beginning in August or September of 1991, the Idlebirds began seeing the child for 6 to 8 hours approximately once a month.

On November 27, 1992, Brittainy, who was then 2 1/2 years old, had her first overnight visit to the Idlebird home. After spending the evening with Mr. Idlebird and Defendant, Brittainy became sleepy at 10:30 or 11:00 p.m. Both Mr. Idlebird and Defendant took Brittainy upstairs and put her to bed. Brittainy woke up while they were putting her to bed and Defendant held and rocked her. Mr. Idlebird left Brittainy's room and did some other things. About 15 minutes later, at approximately 12:00 or 12:30 a.m., Defendant came to their bedroom and told him Brittainy was asleep. Approximately 10 minutes later, they returned to Brittainy's room to kiss her good night. They turned her on her back and left the room together, partially closing the door to Brittainy's room. Mr. Idlebird then went into the bathroom to get a bottle of lotion, with which Defendant could rub his feet.

After Mr. Idlebird returned to their bedroom, Defendant went again into Brittainy's room and put a towel over the lamp. When she returned and told her husband what she had done, he asked her to remove the towel from the lamp, explaining that it was a fire hazard. Defendant had also closed the door to Brittainy's room so that the child would not see Mr. Idlebird walking around in his underwear, but Mr. Idlebird asked her to open it so that he could hear Brittainy if she woke up during the night. She agreed to both open the door and remove the towel after she finished massaging his feet.

Defendant massaged Mr. Idlebird's feet for approximately 30 minutes. He then fell asleep on the middle of the bed. Defendant was lying on the edge of the bed, on the side where her husband normally slept, complaining that her back hurt. She eventually fell asleep in this position.

Shortly before 2 a.m., Mr. Idlebird awoke upon hearing Brittainy cry. Mr. Idlebird ran to his daughter's room and found it engulfed in flames. He grabbed Brittainy, took her downstairs to the kitchen, handed her to Defendant and asked Defendant to call the fire department. Mr. Idlebird then went back upstairs and put out the fire with an extinguisher.

Brittainy was rushed to the hospital by a Life Flight helicopter. She was treated for

extensive burns over 30 to 35 percent of her body. She was hospitalized for three weeks, and required extensive skin grafts to her legs and arms.

Mr. Idlebird eventually returned to the house and checked for signs of a break-in, but found no evidence of a forced entry. He also found no evidence of an electrical fire. Mr. Idlebird testified that he made certain that the smoke detectors in his house were operational and had fresh batteries. However, no alarm sounded and fire investigators later determined that someone had removed the battery from the smoke detector that was located in the hallway outside Brittainy's room. The investigators also found no evidence of forced entry and ruled out any accidental or natural cause of the fire.

Fire investigators determined that the fire originated around or near a "clip" or "retainer" on the bed frame. The burn patterns indicated that the fire was started by the ignition of bedding materials, either a sheet or a comforter. In order to ignite the bedding materials, a match or lighter had to have been placed under the bedding and held there for a "considerable time", i.e., "more than a few seconds". The fire smoldered in the mattress for approximately 45 minutes to one hour before the bed burst into flames.

Investigators did not locate any burnt matches that might have started the fire. The burn pattern and other physical evidence virtually eliminated any possibility that the fire could have been started by Brittainy playing with matches. The fire was labeled as an incendiary-type fire, i.e., "a deliberate act."

Defendant told police that she did not set the fire and did not believe that Brittainy or Mr. Idlebird did either. She said Brittainy was too young to strike a match or use a lighter. She also stated that her husband was asleep on the water bed when the fire broke out and that he could not have gotten out of the bed without waking her. She told the fire investigator that she had laid down with Brittainy until the child fell asleep around 1 a.m. and then returned to her bedroom. Defendant told Brittainy's mother that "she was the last one in the room with Brittainy."

Defendant denied that she was responsible for setting the fire that caused the victim's injuries. Although she admitted that she may have been the last person to enter the girl's bedroom, she said she did so only long enough to put a towel over the lamp. She and Mr. Idlebird disagreed as to whether she left Brittainy's door open or closed. She claimed she had opened it, but he said it was closed when he ran to help Brittainy at the time of the fire.

Although Defendant did not directly accuse Mr. Idlebird of starting the fire, she said that he had displayed little emotion over the incident, did not know how to spell his daughter's first name, and did not know whether she was allergic to any medications. Defendant also said Mr. Idlebird told her that "because they kept questioning him" about what had happened, "as long as [they] stuck together, that everything would be okay."

## II. *LEGAL ANALYSIS*

### A. *Sufficiency of Evidence*

■ Defendant first asserts that the State's evidence was insufficient to sustain her conviction for first degree assault. To find the Defendant guilty of assault, the State was required to prove that Defendant attempted to kill or cause serious physical injury to Brittainy and that, as a result, Brittainy suffered serious physical injury. Defendant does not dispute that Brittainy suffered serious physical injury. Defendant also concedes that the fire was of incendiary origin, that it could not have been set by Brittainy or an intruder, and that the evidence permitted only the inferences that either she set the fire or her husband did so.

■ When reviewing a challenge to the sufficiency of the evidence to support a criminal conviction, appellate review is limited to a determination whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt. *State v. Grim,* 854 S.W.2d 403, 405 (Mo. banc), *cert. denied,* — U.S. ——, 114 S.Ct. 562, 126 L.Ed.2d 462 (1993). When reviewing the sufficiency of the evi-

dence, the appellate court neither weighs the evidence, nor determines the reliability or credibility of witnesses. *State v. Middleton,* 854 S.W.2d 504, 506 (Mo.App.1993). All evidence favorable to the State is accepted as true, including all favorable inferences drawn from the evidence. *Grim,* 854 S.W.2d at 411. All evidence and inferences to the contrary are disregarded unless the inferences are such a natural and logical extension of the evidence that a reasonable juror would be unable to disregard them. *Id.*

■ Defendant contends that the State did not prove beyond a reasonable doubt that she started the fire but simply proved that she and Mr. Idlebird had equal opportunity and motive to commit the crime and that suspicion was equal between them. As she notes, if a jury can draw two equally valid inferences from the same evidence, one probative of guilt and the other not, the evidence does not establish guilt beyond a reasonable doubt. *State v. Mayfield,* 879 S.W.2d 561, 565 (Mo.App.1994). In support of this argument, Defendant asserts that evidence of Mr. Idlebird's motive was much stronger than that of her motive and that the only evidence regarding the criminal events came from Mr. Idlebird.

We agree that Defendant presented sufficient evidence which, if believed by the jury, would have supported a finding in her favor. However, the jury was not required to believe her testimony. The State presented considerable evidence suggesting that Defendant had both the motive and the opportunity to commit the crime. This included the fact that Brittainy was conceived during Mr. Idlebird's relationship with a co-worker that occurred while Defendant and Mr. Idlebird were dating; that on the night the incident occurred, Defendant was the last person to

enter Brittainy's room; that she insisted on closing the door to Brittainy's room; that Defendant was in Brittainy's room at the approximate time the fire was started;[2] and that Defendant's statement to police excluded her husband as a possible suspect as he was asleep on their water bed and he could not have gotten out of bed without waking her.

Mr. Idlebird further testified at trial that he was asleep when the fire started and that he did not set fire to his daughter's bed. Defendant admits that she and Mr. Idlebird were the only potential culprits. Based on this evidence, the jury could well conclude that the two available inferences—that the fire was set by Mr. Idlebird or was set by Defendant—were not equally valid.[3]

■ This is particularly true because a choice between the two available inferences depended on the *credibility* of the testimony provided. The reliability, credibility and weight of the witnesses' testimony is for the jury to determine. *State v. Sumowski,* 794 S.W.2d 643, 645 (Mo. banc 1990). The court must accept the jury's obvious determinations of facts from any conflicting testimony, and the jury's findings are conclusive. *State v. Childers,* 853 S.W.2d 332, 337 (Mo.App. 1993).

■ The jury, in finding the Defendant guilty, impliedly rejected her testimony that she did not set the fire and that Mr. Idlebird had greater motive and equal opportunity to set the fire. The jury may believe all, some or none of a witness' testimony in arriving at a verdict. *State v. Dulany,* 781 S.W.2d 52, 55 (Mo. banc 1989). In the absence of gross inconsistencies and contradictions, resolutions of conflicts in testimony is a matter for

---

**2.** A fire investigator testified that the fire started in the mattress and then smoldered for a period of time before bursting into flames. He testified that this could have taken approximately 45 minutes, placing the time the fire started between 1:00 and 1:15 a.m. He also testified that Defendant told him in an interview that she laid down with Brittainy until the child fell asleep, which was, she estimated, at approximately 1:00 a.m. Defendant's own testimony at trial would place her last visit to Brittainy's room at between 12:30 and 1:00 a.m.

**3.** This distinguishes *State v. Black,* 611 S.W.2d 236 (Mo.App.1980). In *Black,* the "equally valid inferences" related to Defendant's claims that she "accidentally shot" her husband. The court found that this phrase could be interpreted in two ways—that she intentionally shot the gun but accidentally hit and killed her husband or that she unintentionally discharged the gun which killed her husband—and was therefore insufficient to support her conviction.

the jury. *State v. King,* 849 S.W.2d 706, 708 (Mo.App.1993).

■ This Court is bound by the determination of the jury below where there was sufficient evidence for submission. Viewing the evidence in a light most favorable to the State, the evidence was sufficient to support Defendant's conviction for first degree assault.

### B. *Impeachment With Foreign Conviction*

■ Prior to trial, Defendant filed a Motion in Limine requesting the court to preclude the use for impeachment purposes of her 1987 assault conviction in the Netherlands. Generally, a foreign conviction is admissible unless the proceeding giving rise to the conviction so lacked basic due process protections as to render it grossly unfair. *State v. Goldsby,* 845 S.W.2d 636, 641 (Mo. 1992). A foreign felony conviction is not inadmissible for impeachment purposes simply because the foreign legal system lacked certain procedural safeguards enjoyed in this country, if the proceeding as a whole was not unfair. *Id.* A foreign felony conviction thus may be used for impeachment if the foreign jurisdiction provided an accused with the minimum of due process and followed its own procedures during the criminal trial. *Id.*

Defendant's motion in limine asserted that the prior conviction in the Netherlands was inadmissible as impeachment evidence because that trial was so lacking in due process that the trial was fundamentally unfair. In support of her motion, she offered solely her own testimony as to the nature of the proceedings in the Netherlands. She did not support this testimony with any documentation or other proof as to how criminal trials are conducted under Dutch law, or as to how her own trial was conducted.

Defendant testified that, in 1987, she was charged in the Netherlands with assault of her then-husband, a man other than Mr. Idlebird. Defendant stated that she was represented by a court-appointed attorney in a trial before a three-judge panel, that she was denied a trial by jury, that she was not allowed to call witnesses on her own behalf at the trial, and that none of the witnesses against her were brought into open court, nor was she permitted an opportunity to cross-examine any adverse witnesses.

Defendant stated that she was unable to understand any of the proceedings because the entire trial was in Dutch and she was not provided with an interpreter. Although her court-appointed attorney did translate the prosecutor's questions and Defendant's responses when Defendant testified, Defendant also said that she was never informed of the outcome of the trial and did not learn that she had been convicted in the Netherlands until she was charged in the instant case. At the conclusion of the hearing on the motion in limine, the court said it would permit the State to use Defendant's Netherlands conviction for impeachment purposes pursuant to section 491.050.[4]

At trial, perhaps in order to take the "sting" out of the fact that she had previously been convicted for assault, Defendant herself first raised her Netherlands conviction by testifying on *direct examination* that she was convicted of assault in the Netherlands in 1987, for which she received an 11 month sentence. The State questioned her only briefly on this issue on cross-examination. She did not renew her motion in limine at that time.

This Court has serious concern that, if Defendant's description of her Netherlands trial is accurate, her conviction therefrom was lacking in basic due process protections. While lack of a right to jury trial does not itself show a lack of due process, Defendant also claimed that she was not provided with an interpreter even though the entire proceedings were in Dutch (a language she does not speak), was not permitted to call witnesses in her defense, was not permitted to cross-examine any adverse witnesses and was not told the result of her trial. Had the

---

4. This section provides that:
 Any person who has been convicted of a crime is, notwithstanding, a competent witness; however, any prior criminal convictions may be proved to affect his credibility in a civil or criminal case and, further, any ... findings of guilty may be proved to affect his credibility in a criminal case.

State been the first to raise the issue of her prior conviction and had she properly objected to introduction of this evidence, we would be strongly inclined to find that, when these procedural deficiencies are considered together, the Netherlands conviction so lacked basic due process protections that its use for impeachment purposes would have been fundamentally unfair.

 However, by first introducing evidence of the foreign conviction herself, during direct examination, Defendant waived any challenge to the admissibility of the evidence of the prior conviction. *United States v. Smiley,* 997 F.2d 475, 479–80 (8th Cir. 1993); *State v. Middleton,* 854 S.W.2d 504, 516 (Mo.App.1993). Moreover, even had she not raised the issue first, by failing to object to the evidence at trial, she waived any error. The trial judge's prior refusal to sustain her pretrial motion in limine was merely interlocutory in nature and, as such, was subject to change during the course of the trial. *State v. Purlee,* 839 S.W.2d 584, 592 (Mo. banc 1992). The motion in limine, in and of itself, therefore preserved nothing for appeal. *Id.* Accordingly, introduction of evidence of the conviction into evidence was not reversible error.

## C. *Fire as a Dangerous Instrument*

 Defendant claims that the armed criminal action charge should have been dismissed because fire is not a dangerous instrument or deadly weapon and use of fire cannot form the basis of a conviction of the crime of armed criminal action.[5]

At first blush, defendant's argument makes intuitive sense. An armed criminal action charge results from the commission of a felony "by, with, or through the use, assistance, or aid of a dangerous instrument or deadly weapon." § 571.015.1. Missouri defines "deadly weapon" to include "any firearm, loaded or unloaded, or any weapon from which a shot, readily capable of producing

death or serious physical injury may be discharged, or a switchblade knife, dagger, billy, blackjack or metal knuckles." § 556.061(10). Fire clearly does not come within Missouri's definition of a "deadly weapon."

Armed criminal action may also be committed by use of a "dangerous instrument." Missouri defines "dangerous instrument" far more broadly, to include "*any instrument, article or substance,* which, *under the circumstances in which it is used,* is readily capable of causing death or other serious physical injury." § 556.061(9) (emphasis added).

Certainly, fire can be dangerous no matter what its intended use, but the armed criminal action statute requires use of a "dangerous *instrument.*" As used in everyday language, one does not describe "fire" as an instrument. Moreover, neither the State nor Defendant, nor this Court's independent research, has identified prior Missouri reported cases which address whether fire constitutes a dangerous instrument under the armed criminal action statutes when it is used with an intent and motive to cause death or serious harm to a person.

As the State notes, however, other states *have* addressed the issue whether fire is a dangerous instrument or deadly weapon under statutes which require such proof in order to support a conviction. Each such case has found fire does constitute a deadly weapon or dangerous instrument when it is used with the intent to cause harm.

These cases are epitomized by *Taylor v. State,* 735 S.W.2d 930, 948 (Tex.App.1987). In *Taylor,* the issue was whether fire came within the definition of deadly weapon. Texas defines "deadly weapon" to include "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* Like the defendant in this case, Ms. Taylor argued that this definition required use of an instrument which was a tangible thing and that, because fire is

---

**5.** There is no issue in this case that Defendant cannot be charged with both first degree assault and armed criminal action because both charges arise from the same conduct. The state may, in a single proceeding, charge and convict a defendant for the "same conduct" where, as here, the legislature has expressly authorized cumulative punishments under separate statutes. *State v. Mayo,* 829 S.W.2d 474, 475 (Mo.App.1992); *State v. Henderson,* 698 S.W.2d 596, 599 (Mo. App.1985).

nothing more then combustion, fire is not tangible and thus could not be a deadly weapon and so was improperly used as the basis for his conviction. *Taylor* disagreed with the premise that fire is not a tangible thing. It concluded that fire includes the tangible aspects of combustion, such as light and heat, as well as its effect of burning. *Taylor* thus held that the fire was properly used as the basis of Ms. Taylor's conviction for use of a deadly weapon.

*State v. Riddick,* 340 S.E.2d 55, 61 (N.C. 1986), similarly rejected defendant's argument that fire was not an instrument and, therefore, could not in and of itself ever be a deadly weapon within the meaning of the law. *Riddick* found it unnecessary to decide whether fire was a deadly weapon *per se* because fire could, at the very least, be a deadly weapon according to its *manner of use.* *See also Logan v. United States,* 460 A.2d 34, 36 (D.C.1983) (where defendant set fire to books and attempted to shove victim into fire, jury could find defendant intended to harm victim "with a dangerous weapon— namely, fire"); *Josey v. United States,* 135 F.2d 809, 811 (D.C.Cir.1943) (dangerous weapon defined as one "likely to produce death or great bodily injury"); *State v. Mathewson,* 17 Ariz.App. 501, 498 P.2d 575, 577 (1972) (assault by use of fire was a means likely to produce great bodily injury).

A slightly different approach is taken by cases which focus on the fact that a fire has to be started by use of a match, a lighter, or some other instrument, and that use of such an instrument is necessarily a part of the intentional use of fire to cause harm. Thus, *Lozano v. State,* 860 S.W.2d 152, 156 (Tex. App.1993), held that a lighter used to ignite combustible material, causing a fire that killed or badly burned five persons, constituted a "dangerous weapon" under a statute defining the latter as "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." The court held that "[a]lthough a lighter is not a deadly weapon per se, it can qualify as such through the manner of its use and its capacity to produce death or serious bodily injury". *Id.*

As do the statutes involved in the cases just discussed, Missouri's armed criminal action statute defines "dangerous instrument" according to the purpose for which the instrument was being used by defendant at the time of the offense, rather than according to whether it would constitute a weapon when used for its ordinary purposes. The statute states that a dangerous instrument is "any instrument, article or substance, which, *under the circumstances in which it is used,* is readily capable of causing death or other serious physical injury." § 556.061(9) (emphasis added).

While, as noted, Missouri courts have not addressed whether or not fire qualifies as an instrument or substance under this definition, Missouri cases have clearly and specifically held that a dangerous instrument, article or substance encompasses things which are not designed for use as a weapon, including things which normally have a perfectly legitimate function. The key issue is whether the instrument, article or substance is capable of causing death or serious physical injury by the manner of use, and whether the circumstances of use demonstrate an intent and motive to cause such death or serious harm.

For instance, in *State v. Pogue,* 851 S.W.2d 702 (Mo.App.1993), defendant was convicted of involuntary manslaughter and armed criminal action after he caused the death of Ms. Hughes in an automobile accident while driving drunk. He appealed the armed criminal action conviction. The appellate court found that the motor vehicle could not constitute a dangerous instrument in that case because defendant did not *intend* to cause harm with it. However, the court made it clear that:

> [A]n instrument not by design a weapon becomes a dangerous instrument when utilized with the purpose of injuring another. A utilitarian instrument becomes a dangerous instrument when circumstances in which it is used demonstrate an intent and motive to cause death or serious harm to a person.

*Id.* at 706.

A similar analysis was utilized earlier in *State v. Anderson,* 663 S.W.2d 412 (Mo.App.

1983). Defendant robbed a bank, telling the teller that he had a bottle of gasoline under his coat, and that he would drop it and blow the two of them up if she did not hand over the money. The court found that the gasoline was a dangerous instrument, stating:

> The essence of a dangerous instrument is the manner in which the item is used, and inasmuch as the definition refers to any instrument, article or substance, even ordinary items are included within its scope whenever they are "readily capable of causing death or other serious physical injury." ... Whether a particular object is a "dangerous instrument" must be determined by its use under the circumstances. In contrast to a "deadly weapon", a "dangerous instrument" is not designed to be employed as a weapon and under normal use may have a perfectly legitimate function. While a bottle of gasoline may be innocuous in the ordinary sense when used for a harmless purpose, it can readily be transmogrified into a dangerous instrument when employed in a threat to use it as an explosive to produce physical harm.

*Id.* at 416 (citations omitted).[6]

The rationale use in *Pogue* and *Anderson* is identical to that used in the non-Missouri cases discussed above in holding that fire constitutes a dangerous instrument or deadly weapon when it is used with a purpose to cause serious injury. These cases teach us that what constitutes an instrument, article or substance does not depend on the basic physical characteristics or typical use of the thing in question, but rather on whether it was used by defendant as the mechanism (or instrument) for causing death or serious physical injury to the victim. As noted above, some of the non-Missouri cases discussed above have used this rationale to hold that fire's combustibility itself has sufficiently tangible aspects, including heat and light, to constitute an instrument. These same characteristics arguably bring it within the term "substance" as used in the statute. Moreover, we note that fire is, in its essence,

simply the combustion of a fuel, and that fuel certainly is a substance.

In light of the breadth of Missouri's definition of "dangerous instrument," and under the rationale of *Pogue, Anderson,* and the other cases discussed above, we find no error in the trial court's determination that the fact that Mrs. Idlebird started the fire and used it for the purpose and intent of causing death or serious physical injury to Brittainy provided a sufficient basis for Mrs. Idlebird's conviction under the armed criminal action statute.

### D. *Trial Court Criticism of Counsel for Defendant*

■ Defendant claims that the trial court committed reversible error by criticizing her counsel Mr. Speck's cross-examination of Mr. Idlebird in a way which suggested to the jury that the cross-examination was a waste of time. After Mr. Speck asked the court to tell Mr. Idlebird to be more responsive, the following occurred:

> THE COURT: He's answering the question. Go ahead and finish.
>
> MR. SPECK: Judge, I'm getting some awful long, unresponsive answers.
>
> THE COURT: You're getting some awful long questioning too, but if we are going to finish today sometime, let him answer the questions.

After Mr. Idlebird completed his answer, Mr. Speck approached the bench and objected to the court's criticism of his questioning in front of the jury. His objection was overruled.

■ To ensure a fair trial, the trial judge must maintain absolute neutrality and impartiality. *State v. Ross,* 857 S.W.2d 375, 378 (Mo.App.1993). The trial judge must refrain from utterances which suggest or express an opinion as to an issue or which might prejudice the jury against the defendant. *Id.* Other factors used to determine the propriety of a comment include whether it: (1) was volunteered by the trial judge, (2)

---

**6.** *Cf. State v. Moyer,* 298 N.W.2d 768, 770 (Minn. 1980) (intentional ignition of gasoline to create an explosion and fire in an attempt to murder his girlfriend and anyone with her constituted use of

a dangerous weapon); *State v. Campbell,* 287 S.C. 377, 339 S.E.2d 109, 109–10 (1985) (gasoline is deadly weapon).

was not made in response to an objection as part of the court's ruling, (3) was made in the presence of the jury, (4) could have been construed by the jury to the prejudice of the defendant, or (5) indicated to the jury that it was not to reach its own determination of the facts. *Id.* The ultimate issue is whether the judge's conduct was such as to prejudice the minds of the jurors against the defendant, thereby depriving defendant of a fair and impartial trial. *State v. Swigert,* 852 S.W.2d 158, 160–61 (Mo.App.1993).

In this case, the trial court did not suggest or express an opinion regarding an issue in the case. The comment was volunteered and was not made in response to an objection, but it was in response to a statement by Mr. Speck complaining about the length of certain testimony. The comment was made in the presence of the jury but did not indicate to the jury that it was not to reach its own determination of the facts. Moreover, the judge's comment was not of such a nature that it prejudiced the minds of the jury against the defendant. The trial judge did not express an opinion as to the nature, content or truthfulness of the evidence, *Swigert,* 852 S.W.2d at 161, or the defendant's guilt or innocence, *State v. Oplinger,* 847 S.W.2d 156, 158 (Mo.App.1993). He simply indicated that some cross-examination questions were lengthy. Even were this error, and we do not find that it was, it was not prejudicial. This point is denied.

### E. *Cumulative Effect of Errors*

Defendant finally claims that the cumulative effect of the errors committed in this action prevented her from having a fair trial and, as such, require reversal. As no errors were committed, there is no cumulative effect of such errors to consider. *State v. Hunter,* 840 S.W.2d 850, 869–70 (Mo. banc 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 3047, 125 L.Ed.2d 732 (1993).

For all of these reasons, we affirm the judgment of the trial court.

All concur.